**Alfred J. SHEA, Plaintiff,**

**v.**

**ICELANDAIR, Defendant.**

**No. 92 Civ. 7994 (WK) (JCF).**

United States District Court,
S.D. New York.

April 25, 1996.

Jeffrey C. Slade, Leventhal Slade & Krantz, New York City, for plaintiff.

Michael I. Volpe and Alan S. Adolph, Clifton Budd & Demaria, New York City, for defendant.

## MEMORANDUM AND ORDER

FRANCIS, United States Magistrate Judge.

This case lies at the intersection of employment discrimination jurisprudence and personal injury law. Although the jury found that the plaintiff was demoted for discriminatory reasons, his damages are attributable not to any loss in compensation but rather to the fact that he suffered physically and emotionally as a result of the defendant's conduct. At the same time, the plaintiff's disabilities complicate the process of reinstating him to his prior position.

The jury awarded the plaintiff, Alfred Shea, damages of $250,000. The defendant, Icelandair, has now moved pursuant to Rule 59 of the Federal Rules of Civil Procedure for a new trial on damages or, in the alternative, for remittitur. Mr. Shea, in turn, has cross-moved for reinstatement or for an award of front pay. I will address each motion in turn.

*Background*

Since May of 1956, Alfred Shea, an American citizen, has been an employee of Icelandair, which, as its name implies, is an airline based in Iceland. (Tr. at 59).[1] Mr. Shea was employed in the company's cargo department, and in 1971 he became cargo operations manager for the United States, with an office at John F. Kennedy International Airport ("JFK"). (Tr. at 59, 62–63). Mr. Shea remained in this position until 1991. (Tr. at 110–11). In 1980 his official title was modified to "Manager for the Western Hemisphere." (Tr. at 64). While in that position he regularly worked ten- to twelve-hour days and accepted telephone calls at home at night and on weekends when his attention to cargo operations was required. (Tr. at 71–72). In thirty-five years of working for Icelandair, Mr. Shea took only two sick days prior to 1991. (Tr. 72–73). In 1985, he received an industry-wide award for being an outstanding employee in the cargo business. (Tr. at 73–74). Following Mr. Shea's receipt of this award, Icelandair issued a press release that read:

> Al Shea, a 28 year veteran with Icelandair, was chosen for his outstanding contributions in developing the airline's cargo business out of the United States over the years and for maintaining it at high levels, although working with limited manpower assistance. Al was also cited for his fine start-up work in FI's [Icelandair's] new gateways of Baltimore–Washington, Detroit and Orlando. Al works out of offices at JFK, but directs the cargo activities for FI at our other U.S. gateways through local handling companies. It's a busy, often hectic job and one that can involve a substantial amount of travel to the other gateways, but Al loves the line and he is a very popular fellow with his coworkers. Congratulations, Al, and thanks for putting Icelandair in the limelight again, too.

(Tr. at 74–75).

In 1991, at the age of sixty-three, Mr. Shea became the subject of what amounted to a campaign to force his retirement. He received repeated complaints from his superiors about his allegedly unsatisfactory performance and about various mishandled cargo transactions. (Tr. at 85–110). On May 8, 1991, Mr. Shea was summoned into the office of his supervisor, Sigfus Erlingsson. (Tr. at 110). Mr. Erlingsson informed Mr. Shea that the company had decided to demote him because of dissatisfaction with his performance, and implied that age was a factor in the decision. (Tr. at 110–11).[2] Over Mr. Shea's strenuous objections, Icelandair issued a press release to its employees and customers announcing that Mr. Shea was proceeding toward retirement. (Tr. at 121–22).

In the summer of 1991, Mr. Shea was demoted to the position of district sales manager. (Tr. at 116, 119, 122–23). He was replaced by Jon Theodorsson, a younger, less experienced employee of Icelandic origin. (Tr. at 116–17, 119, 122–23). Mr. Shea was relieved of supervisory responsibilities over cargo department employees and was re-

1. Unless otherwise indicated, "Tr." refers to the transcript of the liability portion of the trial. Testimony of a witness during the damages stage is referred to by the witness's name, e.g., "Shea Tr."

2. Mr. Shea gave the following testimony:

Q: What happened on May 8th, 1991?
A: After we had our, excuse me, after we had our weekly meeting, the meeting was over, Sigfus Erlingsson, pulled me aside and said: I'd like to talk to you.
I said: Okay. He closed the door and sat down, and he says: I have some bad news for you. I said: Oh? So I said: What do you mean bad news? So he said: Well, well he said, first he asked: How old are you? And when do you want, when are you going to retire?
Q: What did you say to him?
A: I says, right now I'll probably work till 65 or 67 or longer. So he looked at me. He says, well, he says, I have a request from Iceland. They want to make some changes here. They're dissatisfied with your handling of the cargo operation, cargo department, sales and services. And I said, what do you mean? So then he said, he said: It's not me. It's as far as I'm concerned you have a clean slate. So—it's hard for me to get, I'm sorry. So he says I have a clean slate. And I asked him: Well, who is complaining and what are they complaining about? He says, I do not know. He says, so he said, well, what we are going to do, he says, I am going to be demoted and replaced by someone else....

quired to report to Mr. Theodorsson. (Tr. at 119). Although Mr. Theodorsson took over Mr. Shea's position without assuming any additional duties, he was given the title "Director," which is more prestigious than "Manager" in the Icelandair hierarchy. (Tr. at 123–24). While Mr. Shea's salary was frozen, it was not reduced, and it remained higher than that of Mr. Theodorsson. (Tr. at 122).

Following Mr. Shea's demotion, the atmosphere in the department changed dramatically. Mr. Shea was routinely excluded from department meetings. (Tr. at 126–27). Mr. Theodorsson and Sigurdur Gundmundsson, another employee, consistently spoke Icelandic to each other and to some of the customers in the office, effectively barring Mr. Shea from the conversations. (Tr. at 125–26). Further, the plaintiff was told that it was time to relinquish his role as chairman of Icelandair's pension committee and let the "younger generation" assume leadership. (Tr. at 167–68). Finally, Mr. Shea was often left by himself with the responsibility of answering five telephone lines that sometimes rang simultaneously. (Tr. at 168–70).

Mr. Shea complained to the Equal Employment Opportunity Commission ("EEOC") that he was being discriminated against because of his age and because he was not Icelandic. The EEOC found that age and ethnic origin "were factors in the decision to force [Mr. Shea's] retirement, which led to his subsequent demotion." (Tr. at 172; PX 175).

Following his demotion, Mr. Shea's health rapidly declined. Immediately after the demotion he sought treatment from his physician, Dr. Paul Brodsky. (Shea Tr. at 7–8). In 1992, Mr. Shea was diagnosed with Parkinson's disease, and he began exhibiting significant symptoms. (Shea Tr. at 2–4, 15–16, 21–22). Most recently, in the fall of 1995 Mr. Shea required hospitalization following an angina attack. (Tr. at 169–170). Mr. Shea's cardiologist linked Mr. Shea's heart condition to the stressful situation at work. (Tr. at 320–21).

In 1992, Mr. Shea commenced this action against Icelandair pursuant to the Age Discrimination in Employment Act of 1967, *as amended,* 29 U.S.C. §§ 621–634 ("ADEA"), Title VII of Civil Rights Act of 1964, 42 U.S.C. §§ 2000e through 2000e–17 ("Title VII"), and the New York Human Rights Law, N.Y.Exec.L. §§ 296–298 ("Human Rights Law"). The parties consented to my jurisdiction for all purposes pursuant to 28 U.S.C. § 636(c).

The plaintiff asserted that the defendant's campaign to force him to retire early, culminating in his demotion, exacerbated the symptoms that he suffered as a consequence of Parkinson's disease. He further contended that the conditions he worked under following his demotion resulted in angina attacks in the fall of 1995. In addition to arguing that the defendant willfully discriminated against him on the basis of age and national origin, Mr. Shea contended that Icelandair retaliated against him for filing a grievance with the EEOC.

The trial was bifurcated into liability and damages stages. On December 14, 1995, following the four-day liability phase, the jury found that Icelandair had discriminated against Mr. Shea because of his age by demoting him or adversely affecting the terms and conditions of his employment. However, the jury did not find this discrimination to be willful. The jury also rejected the plaintiff's claims of discrimination based on national origin and on retaliation. After hearing an additional two days of testimony concerning damages, the same jury awarded Mr. Shea $250,000 in compensatory damages for pain and suffering, mental and emotional stress, anguish, humiliation, or loss of enjoyment of life as a result of age discrimination. The jury declined to award the plaintiff any damages for lost compensation or future medical costs.

*Discussion*

A. *Defendant's Motion*

The defendant moves for a partial new trial on the issue of damages, or, in alternative, for remittitur on the ground that the jury's award is excessive.

1. *Standard for New Trial and Remittitur*

In considering a motion for a new trial, in contrast to a motion for judgment as

a matter of law, the trial judge may weigh conflicting evidence and need not view the record in the light most favorable to the nonmoving party. *See Song v. Ives Laboratories, Inc.*, 957 F.2d 1041, 1047 (2d Cir. 1992); *Bevevino v. Saydjari*, 574 F.2d 676, 684 (2d Cir.1978); *United States v. Real Property Known as 77 East 3rd Street, New York, New York*, 869 F.Supp. 1042, 1064 (S.D.N.Y.1994); *Koerner v. Club Mediterranee, S.A.*, 833 F.Supp. 327, 331 (S.D.N.Y. 1993). A motion for a new trial should be granted when "the jury has reached a seriously erroneous result or . . . the verdict is a miscarriage of justice." *Smith v. Lightning Bolt Productions, Inc.*, 861 F.2d 363, 370 (2d Cir.1988). Thus,

> [t]he trial judge, exercising a mature judicial discretion, should view the verdict in the overall setting of the trial; consider the character of the evidence and the complexity or simplicity of the legal principles which the jury was bound to apply to the facts; and abstain from interfering unless it is quite clear that the jury has reached a seriously erroneous result. The judge's duty is essentially to see that there is no miscarriage of justice. If convinced that there has been then it is his duty to set the verdict aside; otherwise not.

*Bevevino*, 574 F.2d at 684. Since the defendant's motion is directed to the size of the damage award, these principles must be applied here in conjunction with those governing purportedly excessive verdicts.

■ A district court that finds a verdict to be excessive does not have the power simply to reduce the damage award. *See Tingley Systems, Inc. v. Norse Systems, Inc.*, 49 F.3d 93, 96 (2d Cir.1995) (citing *Vasbinder v. Scott*, 976 F.2d 118, 122 (2d Cir.1992)); *see also Phelan v. Local 305*, 973 F.2d 1050, 1064 (2d Cir.1992), *cert. denied*, 507 U.S. 972, 113 S.Ct. 1415, 122 L.Ed.2d 785 (1993). It can order a new trial on all issues or one limited to the question of damages. *Tingley Systems*, 49 F.3d at 96. In the alternative, the court may grant remittitur by conditioning denial of a motion for a new trial on the plaintiff's accepting damages in a reduced amount. *Id.* Thus, remittitur is "the process by which a court compels a plaintiff to

choose between reduction of an excessive verdict and a new trial." *Earl v. Bouchard Transportation Co.*, 917 F.2d 1320, 1328 (2d Cir.1990) (quoting *Shu–Tao Lin v. McDonnell Douglas Corp.*, 742 F.2d 45, 49 (2d Cir. 1984)).

■ The threshold task here is to identify the proper standard for determining whether the jury award was excessive. Although this lawsuit was brought in federal court and the plaintiff won a verdict under both the ADEA and the Human Rights Law, the jury awarded damages only for pain and suffering. Since the plaintiff is not entitled to such damages under the ADEA, *see Johnson v. Al Tech Specialties Steel Corp.*, 731 F.2d 143, 147 (2d Cir.1984) (plaintiffs not entitled to recovery for emotional distress under ADEA), the jury award was necessarily rendered pursuant to the pendent state claim.

■ A federal court must apply state substantive law to state claims such as this over which it exercises supplemental jurisdiction. *Baker v. Coughlin*, 77 F.3d 12 (2d Cir.1996) (citing *United Mine Workers of America v. Gibbs*, 383 U.S. 715, 726, 86 S.Ct. 1130, 1139, 16 L.Ed.2d 218 (1966)); *Promisel v. First American Artificial Flowers, Inc.*, 943 F.2d 251, 257 (2d Cir.1991), *cert. denied*, 502 U.S. 1060, 112 S.Ct. 939, 117 L.Ed.2d 110 (1992). Here, the question of how much money Mr. Shea may be awarded for pain and suffering attributable to a violation of the Human Rights Law is an issue of substantive rights. *See Consorti v. Armstrong World Industries*, 72 F.3d 1003, 1011 (2d Cir.1995). Therefore, New York state law regarding the excessiveness of the verdict must be applied.

■ This choice is significant. In cases where federal law governs, a jury's verdict may not be overturned unless it is so excessive that it shocks the conscience of the court. *See id.; Scala v. Moore McCormack Lines, Inc.*, 985 F.2d 680, 683 (2d Cir.1993); *Wade v. Orange County Sheriff's Office*, 844 F.2d 951, 955 (2d Cir.1988). By contrast, the state standard is far less deferential:

> In reviewing a money judgment in an action . . . in which it is contended that the award is excessive or inadequate and that a new trial should have been granted un-

less a stipulation is entered to a different award, the appellate division shall determine that an award is excessive or inadequate if it *deviates materially* from what would be reasonable compensation.

N.Y.Civ.Prac.L. & R. § 5501(c) (McKinney Supp.1995) (emphasis added).

The inquiry does not stop here. The New York State Legislature adopted Section 5501 in its current form in 1986. Previously, both trial and appellate courts in New York had applied the "shocks the conscience" test to jury verdicts. *See, e.g., Neal v. Rainbow House Fruits,* 87 A.D.2d 511, 512, 447 N.Y.S.2d 487, 488 (1st Dep't 1982). The 1986 amendment explicitly requires only the Appellate Division to apply the "deviates materially" standard. Thus, it leaves open the possibility that state trial courts—and, by analogy, federal district courts exercising supplemental jurisdiction—are intended to continue using the "shocks the conscience" test.[3] *See Consorti,* 72 F.3d at 1012–13; David D. Siegel, *Supplementary Practice Commentary,* C5501:10 *reprinted in* 7B McKinney's Consolidated Laws of New York Ann. at 25–26 (1995).

■ Where, as here, the highest state court has not spoken on an issue of substantive state law, a federal court must attempt to forecast how that court will rule. *O'Neill v. City of Auburn,* 23 F.3d 685, 689–90 (2d Cir.1994); *In re Brooklyn Navy Yard Asbestos Litigation,* 971 F.2d 831, 850 (2d Cir. 1992). Lower state court decisions, while not binding, carry substantial weight in formulating that prediction. *See O'Neill,* 23 F.3d at 690.

■ Here, three out of four of the Appellate Division departments have held that the state trial courts are bound by the "deviates materially" standard. *See Inya v. Ide Hyundai, Inc.,* 209 A.D.2d 1015, 1015, 619 N.Y.S.2d 440, 440 (4th Dep't 1994); *Prunty v. YMCA of Lockport, Inc.,* 206 A.D.2d 911, 912, 616 N.Y.S.2d 117, 118 (4th Dep't 1994); *Cochetti v. Gralow,* 192 A.D.2d 974, 975, 597 N.Y.S.2d 234, 235 (3d Dep't 1993); *Shurgan v. Tedesco,* 179 A.D.2d 805, 806, 578 N.Y.S.2d 658, 659 (2d Dep't 1992). Furthermore, at least one federal district court has applied this test to a jury verdict under the Human Rights Law in an age discrimination case. *Lightfoot v. Union Carbide Corp.,* 901 F.Supp. 166, 169 (S.D.N.Y.1995); *see also Travelers Companies v. New York General Mechanical, Inc.,* No. 90–CV–0902E(M), 1994 WL 584926, at *1 (W.D.N.Y. Oct. 12, 1994) (applying § 5501(c) to damages in a diversity action); *but see McIntosh v. Irving Trust Co.,* 887 F.Supp. 662, 664 (S.D.N.Y. 1995) (applying "shocks the conscience" test to verdict under Human Rights Law without reference to N.Y.Civ.Prac.L. & R. § 5501(c)).

While the Appellate Division opinions incorporate little legal analysis, they are uniform in their result. Furthermore, it would be anomalous for trial courts and appellate courts to review the same jury verdict using different standards. I therefore conclude that the New York Court of Appeals would most likely rule that the "deviates materially" standard must be used by trial courts, and I will utilize it here.

■ In evaluating the magnitude of a jury verdict, "the best guide for a federal court, if

---

**3.** In some cases the standard makes no difference to the outcome, as when the court finds that the jury's damage award would not be excessive under either test. *See Lavery v. Meteor Messenger Service, Inc.,* No. 94 Civ. 1177 (DLC), 1996 WL 11213, at *6 (S.D.N.Y. Jan. 10, 1996). At least one court has considered the distinction to be of no practical effect where a verdict is excessive under either standard. *See Datskow v. Teledyne Continental Motors Aircraft Products,* 826 F.Supp. 677, 690 (W.D.N.Y.1993). However, even if an award both shocks the conscience and materially deviates from other verdicts, the amount of remittitur that is appropriate will depend on the test that is applied. Remitting an award to the maximum amount that no longer shocks the conscience could well involve less of a

reduction than remittitur that would bring the award in line with other verdicts. Finally, one court has suggested that the two standards are compatible because "[it] 'shocks the conscience' of a federal judge for a federal court sitting in diversity to allow a verdict which would necessarily be remitted as a matter of law by a state court using the appropriate state standard." *In re Joint Eastern & Southern Dists. Asbestos Litig.,* 798 F.Supp. 925, 937 (E. & S.D.N.Y.1992), *rev'd on other grounds,* 995 F.2d 343 (2d Cir.1993). Unfortunately, this creative approach is ultimately unsuccessful because the subject of inquiry under the "shocks the conscience" test is the size of the award, not considerations of comity between the state and federal courts.

available, would be decisions of the state's courts in comparable cases indicating at what point awards become excessive." *Consorti,* 72 F.3d at 1013. Such decisions, however, are instructive rather than binding. *See id.* at 1012; *Martell v. Boardwalk Enterprises, Inc.,* 748 F.2d 740, 750 (2d Cir.1984); *Senko v. Fonda,* 53 A.D.2d 638, 639, 384 N.Y.S.2d 849, 851 (2d Dep't 1976). This is the case, in part, because "any given judgment depends upon a unique set of facts and circumstances." *Nairm v. National R.R. Passenger Corp.,* 837 F.2d 565, 568 (2d Cir.1988). Accordingly, I will now turn to the facts underlying the jury's award.

### 2. *Evidence at Trial*

#### a. *Parkinson's Disease*

The most important factor that sets this case apart from others involving emotional pain and suffering is the fact that Icelandair's discriminatory conduct had physical consequences. In 1992, six months after the demotion, Mr. Shea was diagnosed with Parkinson's disease. He is now experiencing a number of debilitating symptoms including muscle spasms, insomnia, slurred speech, rigidity, tremors, and loss of balance. (Shea Tr. at 12, 20–22). Mr. Shea testified about the progress of the disease:

Q: What is happening with your Parkinson's disease, sir?

A: It's worsening.

Q: What particular problems are you having now?

A: Well, the balance problems are more ... I have been falling around the house and on my property when I'm trying to do some work outside last year, and I have to be very careful how I walk, and I have to hold on to the bannister and things like that ... I trip and I become very clumsy.

I spill things, a cup of coffee or something on my desk. I've never done that before.

(Shea Tr. 20–21). These symptoms have significantly altered Mr. Shea's lifestyle. Once an active sportsman, he can no longer bike, play golf, garden, or engage in a variety of tasks around the house. (Shea Tr. at 2–4, 21–22). Mr. Shea also confessed that he fears the future:

Q: Mr. Shea, the fact that your Parkinson's disease is getting worse, what affect [sic] has that had on you emotionally?

A: It has a devastating effect on me emotionally. It is very hard on me. I, I, I dread the future. I, I—it's just not a good situation; poor situation.

(Shea Tr. at 22).

Dr. Paul Roach, the plaintiff's expert, testified at length that there is a definite relationship between stress and the aggravation of Parkinson's disease. (Roach Tr. at 8–11). He explained that the linkage is attributable to "free radicals," molecules that are formed during the normal course of metabolism in the body. These free radicals are attracted to lipid or fatty tissues in the body, particularly in the brain. Once they attach to the tissue they disrupt the natural functions in the cell. This process is characteristic of Parkinson's disease as well as other neurodegenerative conditions. (Roach Tr. at 12). Dr. Roach further testified that emotional stress has been shown to increase the production of free radicals. (Roach Tr. at 11).

With respect to Mr. Shea specifically, Dr. Roach testified that demotion-related stress played a significant part in exacerbating the symptoms of Parkinson's disease:

Q: Now based on everything that you looked at and your 40 years of experience, did you formulate an opinion as to whether the occupational stress sustained by Mr. Shea was a competent producing factor in the development or the aggravation of his Parkinson's disease?

A: I did.

Q: And what is your opinion, Doctor?

A: Very definitely.

Q: Now, what specifically did you look at, sir, when you reached that opinion?

A: Well, I looked at the history of the progression of his disorder, the temporal relationship between his job stress and the accelerated symptoms

and signs that he experienced, and I think that speaks for itself.

Q: You know that he was under the case or had been examined by a Dr. Mortati, is that right?

A: I recall that, yes.

Q: Right. And did you note that Dr. Mortati had diagnosed Parkinson's disease in the early part of 1992?

A: That's correct.

Q: And did you note Dr. Mortati's notation that, "It is probably significant that the patient has been under extreme emotional stress regarding his job in these past six months?" Did you note that?

A: Yeah. I thought that was quite interesting. It was at the bottom of the page and—

Q: Did that play a role in your opinion, sir?

A: Well, I think it is interesting that a regular physician would spontaneously make that comment. It is something I would be looking for, but which busy doctors don't usually have time to discuss with patients.

(Roach Tr. at 13). Dr. Roach further testified that although it is undisputed that other factors play a role in the progression of Parkinson's disease, in this case stress was very important:

Q: [Defense counsel] asked you a number of questions about discrete instances of stress and you said you had no [way] of knowing whether any particular discrete instance of stress would have a causative effect or an aggravating effect on the Parkinson's disease. What about a continued pattern of stress such as Mr. Shea went [through], what is your opinion?

A: Well, I think the type of stress that is described certainly looking at Mr. Shea's background, the type of stress he had in the workplace was a severe stressor for him and, again, I can only talk in general terms based on the literature we have, the relationship between stress and free radicals.

There are so many other factors that enter into it; what medication he was taking, what diet he was on, whether he was taking certain antioxidant vitamins. I can't say with certainty that this did this or that did that, but certainly any type of stress that he perceived as being distressful would have had an adverse effect on him.

Q: And by adverse effect, you mean an aggravation—

A: Harmful.

(Roach Tr. at 31).

The defendant's expert, Dr. Seymour Gendelman, categorically denied that Parkinson's disease can be caused by stress, but he conceded that Parkinson's symptoms can be made worse by a period of stress. (Gendelman Tr. at 25). Dr. Gendelman testified:

Q: Is there any accepted, commonly accepted or commonly available information or theory as to a connection between stress and Parkinson's disease?

A: You mean in a causative manner?

Q: Causative.

A: Stress does not cause Parkinson. Stress can make—

Q: You say that without qualification, sir?

A: Oh, yes. Stress can make the symptoms worse for a period of time, but when the stress subsides the symptoms get better. That's a characteristic of the illness.

(Gendelman Tr. at 25).

b. *Heart Disease*

Mr. Shea and his cardiologist, Dr. Gregory Strachovsky, also testified that the plaintiff suffered cardiac symptoms as a result of the defendant's conduct. (Tr. at 168–70, 311–25, Shea Tr. at 26–28). Dr. Strachovsky testified that Mr. Shea's angina attack in the fall of 1995 had been related to stress at work. (Tr. at 312–18). Based on this conclusion, the doctor wrote a letter to Mr. Theodorsson stating:

Please be advised that Alfred Shea has atherosclerotic heart disease with a positive thallium stress test performed on 10/6/95. This study revealed inferior and

inferolateral ischemia consistent with the diagnosis of coronary artery disease. He has had recent onset of retrosternum chest pain, exacerbated by stress at work. He states that when he is in the office answering five phones and alone, symptoms of angina pectoris manifest.

I have advised Mr. Shea to reduce his workload and to avoid overly stressful situations. Times of excessive stress may precipitate further symptoms of angina pectoris and possibly precipitate a cardiac event.

If you have need of more specific information, please feel free to contact my office.

(PX 301; Tr. at 320–21). Similarly, Dr. Roach linked the aggravation of the heart condition to Mr. Shea's work-related stress:

Q: ... Have you recently had occasion to look at the records concerning Mr. Shea's heart condition?

A: Yes.

Q: And I believe you testified before that there is a correlation between emotional stress, job stress and some kinds of heart disease, is that right?

A: Yes.

\* \* \* \* \* \*

Q: Based on your review of Mr. Shea's medical records and your knowledge of the field, did you reach an opinion as to whether the job stress was the competent producing factor with respect to his coronary heart disease?

A: In my opinion, definitely.

(Roach Tr. at 15–16).

### c. *Humiliation and Emotional Distress*

In addition to the testimony about physical consequences of the defendant's conduct, Mr. Shea presented compelling evidence of his emotional anguish and humiliation. He testified that he felt upset and sick, experienced sleep problems, and was unable to hold down his food. (Shea Tr. at 7–8). The morning after receiving his demotion letter he went to see his physician, Dr. Brodsky, complaining of headache, stomachache, and depression. (Shea Tr. at 8). Dr. Brodsky's notes from

that examination, introduced at trial, state: "Stress from his job. For the past week or two does not feel well. Gets diarrhea, stomach pains. Also getting pressure in his chest. Headaches. Not sleeping well.... Imp[ression]. Anxiety–Depression." (DX GGG). After initially obtaining a prescription from Dr. Brodsky, Mr. Shea had to return for more medication because he continued to suffer depression. Dr. Brodsky's notes from the subsequent visit on August 31, 1991 state: "[s]till depressed, anxious—job loss." (DX GGG; Shea Tr. at 8–9). Dr. Brodsky suggested that Mr. Shea seek psychological help, but the plaintiff chose not to obtain counseling since he hoped that the anxiety would abate. (Shea Tr. at 8–9).

Mr. Shea also experienced mental anguish from the fact that he was required to inform over three hundred of his regular customers of his demotion and give them his new business card indicating his diminished position. (Shea Tr. at 10). Subsequently, some of these customers started "going around" Mr. Shea, because he was no longer in charge. (Shea Tr. at 34–36). Additionally, although he continued to attend cargo managers' meetings, Mr. Shea felt that he was invited only out of pity. (Shea Tr. at 11). Within his department, various employees made it clear to him that he was no longer in control. (Shea Tr. at 11).

The defendant downplays these aspects of Mr. Shea's claim of emotional pain and suffering by arguing that he did not demonstrate that he was treated disparagingly or suffered any loss of esteem among his colleagues following his demotion. However, the jury could infer from these incidents that Mr. Shea's colleagues and customers treated him differently following his demotion and that Mr. Shea found this treatment demeaning.

The demotion had detrimental effects on Mr. Shea's personal as well as his professional life. Although he did tell his wife of the demotion, he did not reveal it to his four children until almost a year later, or to his sisters and brothers until more than three years later. (Shea Tr. at 12–13). He stopped attending most family gatherings (Shea Tr. at 13), and his relationship with his

wife suffered as he became increasingly short-tempered and angry in the period following his demotion. (Shea Tr. at 40).

This evidence must now be viewed in the context of other damage awards.

### 3. Comparison with Other Verdicts

On its face, the award in this case may appear to deviate materially from other judgments under the Human Rights Law. *See, e.g., Lightfoot v. Union Carbide,* 901 F.Supp. 166, 170 (S.D.N.Y.1995) (reducing award of $750,000 to $75,000); *Binder v. LILCO,* 847 F.Supp. 1007, 1028 (E.D.N.Y.1994) ($497,738 jury award for pain and suffering in ADEA and Human Rights Law action remitted to $5,000), *aff'd in part and rev'd in part,* 57 F.3d 193, 202 (2d Cir.1995); *Borja–Fierro v. Girozentrale Vienna Bank,* No. 91 Civ. 8743 (CMM), 1994 WL 240360, at *4 (S.D.N.Y. May 27, 1994) (reducing award from $160,000 to $15,000 where plaintiff was sole witness and gave only brief testimony); *Quality Care, Inc. v. Rosa,* 194 A.D.2d 610, 611, 599 N.Y.S.2d 65, 66 (2d Dep't 1993) (ordering reduction of $10,000 award for mental anguish and humiliation under Human Rights Law to an amount no greater than $5,000 absent evidence of duration or severity of complainant's condition and medical treatment received); *Pioneer Group v. State Division of Human Rights,* 174 A.D.2d 1041, 1042, 572 N.Y.S.2d 207, 208 (4th Dep't 1991) (reducing $10,000 award for mental anguish to $5,000); *Cosmos Forms, Ltd. v. State Division of Human Rights,* 150 A.D.2d 442, 442, 541 N.Y.S.2d 50, 51 (2d Dep't 1989) (reducing $35,000 award to no more than $5,000 where only evidence of mental anguish was complainant's testimony that she was "emotionally screwed up").

However, under closer scrutiny, this case presents a distinguishable and much more compelling set of facts than the cases cited above. The majority of those cases concern what one court referred to as "garden variety emotional distress." *See Luciano v. Olsten Corp.,* 912 F.Supp. 663, 673 (E.D.N.Y.1996) (collecting cases). Clearly, the jury in this case found that the plaintiff's damages were not of the ordinary kind, and the record amply supports this finding.

#### a. Aggravation of Physical Symptoms

First, this case is set apart by the magnitude of the physical injuries suffered by the plaintiff.

The defendant vigorously disputes that any of Mr. Shea's physical symptoms were caused or exacerbated by its discriminatory conduct. Rather, the defendant argues, these physical effects are due entirely to the natural progression of Parkinson's disease and coronary artery disease.

Both sides agree that Mr. Shea would have developed Parkinson's disease regardless of the defendant's conduct. Nevertheless, the defendant is not absolved of culpability. It is well settled that aggravation of a preexisting condition gives rise to liability. *Maurer v. United States,* 668 F.2d 98, 99–100 (2d Cir.1981); *Milos v. Sea–Land Serv., Inc.,* 478 F.Supp. 1019, 1023 (S.D.N.Y. 1979), *aff'd,* 622 F.2d 574 (2d Cir.), *cert. denied,* 449 U.S. 954, 101 S.Ct. 360, 66 L.Ed.2d 219 (1980); 36 N.Y.Jur. *Damages,* § 62.

Thus, for example, in a case analogous to this one, a jury found that an engineer was entitled to damages because stress from unsafe employment conditions led to an angina attack. *Gorman v. Prudential Lines, Inc.,* 637 F.Supp. 879, 881 (S.D.N.Y.1986). At trial the plaintiff's expert testified that although the plaintiff had a long-term buildup of fatty deposits in his coronary arteries, the immediate cause of his angina was the extreme stress to which he was subjected by unsafe working conditions. By contrast, the defendant's expert testified that:

> [C]oronary artery disease of the type and degree suffered by [the plaintiff] was the product of many years of gradual accumulation of plaque, a function of diet and heredity, and ... working conditions, no matter how stressful, would not produce a significant rapid increase in the accumulation or trigger an acute angina attack.

*Id.* at 881. On a motion for judgment notwithstanding the verdict, the court found that "the fact that [the plaintiff's] coronary artery disease was inexorably progressing to an eventual complete arterial blockage with resulting myocardial infarction or 'heart at-

tack'" did not defeat the plaintiff's claim. *Id.* at 882. In reaching this conclusion, the court relied on the "well-established 'thin skulled plaintiff' rule [under which] a tortfeasor must take the victim 'as he finds him,' and is responsible for any aggravation or acceleration of an existing disease or infirmity if the defendant's breach of duty 'played any part, even the slightest' in producing the injury." *Id.* (citations omitted). Accordingly, the court upheld the jury award of $125,000, reduced by 75 percent because of the plaintiff's contributory negligence.

Other courts have also grappled with the effect of a preexisting condition on an award for pain and suffering. In *Taylor v. National R.R. Passenger Corp.*, 868 F.Supp. 479, 485 (E.D.N.Y.1994), the court considered the extent to which a fall caused by a malfunctioning escalator aggravated the plaintiff's preexisting degenerative disk disease and arthritis. The defendant's expert testified that "some, if not all, of plaintiff's symptoms originate from degenerative disc disease and her arthritic condition, rather than from the accident at issue." *Id.* at 486. On a motion for remittitur, the court left in place the jury's award of $105,000 for past pain and suffering, and reduced the award of $275,000 for future pain and suffering to $175,000. *Id.* In arriving at the new figure the court reasoned that only some of the plaintiff's activities were curtailed, that her injury did not require surgery, and that the preexisting condition gave rise to at least some of the symptoms. *Id.; see also Gumbs v. Pueblo, Int'l Inc.*, 823 F.2d 768, 775 (3d Cir.1987) (reducing $900,000 award for disc herniation to approximately $239,000 in part because plaintiff suffered from preexisting osteoarthritic condition); *Smith v. John Swafford Furniture*, 614 F.2d 552, 554 (6th Cir.1980) (upholding remittitur where medical evidence was equivocal on whether permanent disability was due to accident or degenerative disc disease).

These cases lead to two conclusions relevant here. First, a jury in its capacity as a fact-finder may chose between competing theories of causation. Second, the mere fact that the plaintiff suffered from a degenerative disease does not mean that a jury may not place a numerical value on the pain and suffering associated with aggravation of that condition due to the defendant's conduct.

In this case the two opposing experts offered differing theories of the relationship between stress and the progression of Parkinson's disease. Dr. Gendelman testified that discrete instances of stress create "bumps" on the baseline of the normal progression of the disease. (Gendelman Tr. at 25–26). These "bumps" represent the exacerbation of symptoms, which return to the normal baseline after the stress subsides. (Gendelman Tr. at 26). Dr. Roach, however, denied that there is such a baseline or normal rate of progression for the disease (Roach Tr. at 28). He testified that discrete instances of stress can indeed accelerate the progress of Parkinsonianism. (Roach Tr. at 29).

Given two conflicting expert opinions the jury could have accepted Dr. Roach's theory of the relationship between stress and the progression of Mr. Shea's Parkinson's disease.[4] Furthermore, although the opposing experts disagreed on the duration of the effects of stress on the symptoms of Parkinson's disease, they agreed that it does exacerbate the symptoms, at least temporarily. Thus, the plaintiff would be entitled to damages for pain and suffering at least for the period during which his symptoms flared up as a result of the defendant's conduct.

Although somewhat contradictory, the scientific evidence supporting causation in this case is much stronger than in those cases where no connection was found between tor-

---

4. The defendant did not challenge the plaintiff's expert testimony as unreliable and subject to exclusion under *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). Under *Daubert* a trial judge must determine whether "the expert is proposing to testify to (1) scientific knowledge that (2) will assist the trier of fact to understand or determine a fact in issue." 509 U.S. at ——, 113 S.Ct. at 2796. This determination of admissibility involves assessment of whether the reasoning and methodology underlying the testimony are scientifically valid. *Id.* Had the defendant believed that the plaintiff's expert testimony was not scientifically valid and thus subject to exclusion, it could have filed a motion *in limine.*

tious conduct and aggravation of a preexisting medical condition. *See, e.g., Evans v. United Arab Shipping Co.*, 4 F.3d 207, 213 (3d Cir.1993) (because of medical uncertainty and equivocal expert testimony at trial, district court unable to separate aggravation caused by defendant from normal course of neurological disease), *cert. denied*, —— U.S. ——, 114 S.Ct. 1065, 127 L.Ed.2d 385 (1994); *Richardson v. Britton*, 192 F.2d 423, 424 (D.C.Cir.1951) (although contrary medical evidence was presented, there was sufficient evidence to conclude that plaintiff's Parkinson's disease not caused by blow on the head during automobile collision), *cert. denied*, 343 U.S. 920, 72 S.Ct. 676, 96 L.Ed. 1334 (1952); *Doberstein v. Curtiss–Wright Corp.*, 273 A.D. 935, 935, 79 N.Y.S.2d 184, 184 (3d Dep't 1948) (denial of workman's compensation justified in light of "sharp conflict of evidence" as to whether plaintiff's Parkinson's disease was caused by work-related conditions). It was not clearly erroneous for the jury to find that stress arising from Icelandair's discriminatory conduct aggravated or accelerated the progression of Mr. Shea's Parkinson's symptoms.

A similar analysis applies to the connection between stress related to Mr. Shea's demotion and the onset of angina attacks. He presented competent expert evidence of the causal link between them and is therefore entitled to recover damages for the exacerbation of these physical symptoms as well.

Finally, the defendant contends that by rejecting any award for future medical costs, the jury implicitly rejected the plaintiff's claim that his medical conditions were caused or exacerbated by discriminatory conduct. Specifically, on the verdict sheet the jury answered "No" to the question "Do you find that the plaintiff has proven by a preponderance of the evidence that he has incurred or will incur medical costs as a result of age discrimination?" Therefore, the defendant contends, it was erroneous to award damages based on evidence of the emotional pain and suffering caused by Mr. Shea's Parkinson's disease or his coronary artery disease.

There is no support in the record for this proposition. It is complete speculation on the part of the defendant to suggest that the jury did not award Mr. Shea medical costs because it rejected the causation argument. In fact, the two parts of the verdict are easily reconciled. For example, the jury could have determined that discrete instances of stress worsened the plaintiff's symptoms in the past but will not continue to aggravate them in the future. This conclusion would make the award of future medical costs inappropriate. Alternatively, the jury could have found simply that the plaintiff failed to present sufficient evidence of specific future medical costs. Thus, the evidence that the defendant's conduct aggravated the plaintiff's physical condition supports a substantial damage award.

### b. *Severity of Emotional Distress*

Awards for emotional distress under The New York Human Rights Law can be thought of as arrayed along a continuum. At one end are the cases relied on by the defendant that were referred to above. They are distinguishable because the awards in those cases were reduced largely because of a lack of evidence regarding the severity, duration, and consequences of the emotional disorder. *See, e.g., McIntosh*, 887 F.Supp. at 664–65 (granting motion for new trial or remittitur where plaintiff "did not testify in any detail with respect to the magnitude or the duration of any mental distress[,] did not testify that his life activities were curtailed in any way [, and] there was no evidence that the plaintiff sought any medical or psychological help except for one visit[.]"); *see also Borja–Fierro*, 1994 WL 240360, at *4 (reducing award based solely on plaintiff's testimony and comparing it to other cases where courts remitted "jury awards based on similarly vague and conclusory testimony regarding mental anguish").

In contrast, Mr. Shea testified that the humiliation, shame, and fear that he experienced after he was demoted in 1991 have continued to the present day. As recounted above, he testified about the devastation he experienced when his long-term customers began ignoring him and his former subordinates disregarded his opinion. He also

testified that immediately following the demotion he began experiencing depression and anxiety for which he sought medical intervention.

It is true that Mr. Shea failed to seek psychiatric help for his emotional anguish. *See Manhattan & Bronx Surface Transit Operating Authority v. New York State Executive Dep't,* —— A.D.2d ——, ——, 632 N.Y.S.2d 642, 644 (2d Dep't 1995) (reducing damages for emotional pain and suffering from $30,000 to $7,500 in part because petitioner did not seek medical or psychiatric assistance for his emotional turmoil). He did seek medical assistance from Dr. Brodsky, who recommended that Mr. Shea see a psychiatrist. (DX GGG). But Mr. Shea did not take this advice because he doubted that such counseling would help:

Q: And what did Dr. Brodsky tell you at that time?

A: Well, Dr. Brodsky told me that I was still depressed and had anxiety, and he, he, he gave me more medication, I think it was Valium this time, and then he also suggested perhaps I should see a psychologist to perhaps get to the bottom of this.

But I thought about that and I had said, well, I already know what's causing this, Dr. Brodsky. It hasn't bothered me before and its [sic] obvious what it is and hopefully, this will be over soon.

(Shea Tr. 8–9). This failure to obtain professional psychiatric care, while undermining the plaintiff's case to some extent, does not place it on a par with the garden variety emotional distress cases relied on by the defendant.

At the other end of the spectrum are those cases where the defendant's repeated and intentional discriminatory conduct resulted in significant emotional pain and suffering. For example, in *New York City Transit Authority v. State Division of Human Rights,* 78 N.Y.2d 207, 573 N.Y.S.2d 49, 577 N.E.2d 40 (1991), *on remand,* 181 A.D.2d 891, 894–95, 581 N.Y.S.2d 426, 429 (2d Dep't 1992), the employer refused to place the plaintiff, a bus driver, on light duty despite a doctor's letter warning that the plaintiff could jeopardize her pregnancy unless her activity was restricted. *Id.* at 892, 581 N.Y.S.2d at 428. Following the employer's refusal to accommodate her, the plaintiff suffered a miscarriage. *Id.* at 893, 581 N.Y.S.2d at 428. She then sought compensatory damages for four separate acts of sex discrimination: (1) refusing to place her on restricted duty during her pregnancy; (2) refusing to restore her to full-time duty after her miscarriage; (3) requiring her to submit to psychiatric evaluation when she requested reinstatement; and (4) forcing her to go out on unpaid leave when she requested a restricted duty assignment. *Id.,* 581 N.Y.S.2d at 428. In reinstating a $450,000 award, the Appellate Division noted:

> The complainant was the victim of a series of four intentional episodes of sex discrimination that continued for a period of in excess of one year. She testified that she suffered anguish, guilt, depression, and anger at the time of each occurrence, and that her mental anguish persisted even to the time of the hearing in late 1987 and early 1988, a period of more than six years. Indeed, there is sufficient evidence to support the Commissioner's conclusion that her mental anguish, caused by the unlawful acts of the NYCTA, will continue for the rest of her life.

*Id.* at 894–95, 581 N.Y.S.2d at 429. The court found that this large award was appropriate in light of what the judge found to be " 'the most shocking instance of abuse of an employee by an employer' in his 20–year experience with the Division of Human Rights." *Id.* at 894, 581 N.Y.S.2d at 429.

As in *New York City Transit Authority,* Mr. Shea's mental anguish and humiliation were profound and lasting, rather than slight and temporary. However, they were based on the discrete episode of his demotion rather than on multiple acts of discrimination. Additionally, the jury in the present case did not find Icelandair's conduct to be willful.

Similarly, in *Smith v. Tiffany & Co.,* No. 1B–E–CS–84–97230, at 308 (State Div. of Human Rights, Aug. 11, 1995), *aff'd,* —— A.D.2d ——, 638 N.Y.S.2d 454 (1st Dep't 1996), the complainant, who was a subject of repeated and continuous sexual harassment and religious discrimination, testified that

"[s]he felt degraded, tortured and brutalized." *Id.* at 17 (quotation and citation omitted). She developed a "severe narcissistic injury or blow to her self-esteem, [and] experienced severe depression, anxiety, agitation, occasional anorexia and insomnia." *Id.* at 18. Accordingly, the Appellate Division upheld an award of $300,000. Mr. Shea likewise testified to experiencing depression, anxiety and insomnia. However, the discriminatory conduct in *Smith* was willful, while in this case the jury did not make such a finding. *See also Whitford v. Frederick Goldman, Inc.*, No. 91 Civ. 3201 (SAS), 1995 WL 511134, at *4 (S.D.N.Y. July 14, 1995) (refusing to set aside the $100,000 award for emotional pain and suffering as excessive and inconsistent with finding that defendant's intentional conduct did not cause plaintiff severe emotional distress); *Sogg v. American Airlines*, 193 A.D.2d 153, 164, 603 N.Y.S.2d 21, 28 (1st Dep't 1993) (upholding reduction of $1.12 million verdict for emotional distress following intentional sex, age, and disability discrimination to $400,000).

Nevertheless, the defendant argues that only a small damage award is warranted here because Mr. Shea was demoted rather than terminated. While it is true that, all things being equal, losing one's job may be more distressing than being demoted, the degree of mental anguish and emotional pain and suffering is measured by its severity and continuity rather than by the specific precipitating action. *See, e.g., Spence v. Board of Education of the Christina School District*, 806 F.2d 1198, 1201 (3d Cir.1986) (factors in determining mental anguish damages include loss of esteem by colleagues, physical harm stemming from emotional anguish, emotional distress resulting from loss of income, and evidence of psychiatric help being sought or rendered).

In conclusion, having considered the extent of Mr. Shea's emotional pain and suffering in light of similar employment discrimination cases, I find limited remittitur appropriate. The court "should remit the jury's award only to the maximum amount that would be upheld by the district court as not excessive." *Earl*, 917 F.2d at 1330. Thus, in this case the remitted award should represent the maximum amount that would not "deviate materially" from awards in similar cases. The determination of damages for emotional pain and suffering does not amount to mere arithmetic, and instead is designed to make the victim of discrimination whole. As the Second Circuit recently stated,

> [W]e must recognize that compensation for suffering can be accomplished only in a symbolic and arbitrary fashion. There are at least two serious shortcomings to the endeavor. First, money awards do not make one whole; they do not alleviate pain. Second, there is no rational scale that justifies the award of any particular amount, as opposed to some very different amount, in compensation for a particular quantum of pain.

*Consorti*, 72 F.3d at 1009 (citations omitted). Unquestionably, the plaintiff in this case suffered both physically and emotionally, and this suffering was, in part, due to the defendant's discriminatory conduct. Thus, the award must be more substantial than in those cases where emotional distress was minimal or incidental.

However, the record does not fully illuminate the question of how rapidly Mr. Shea's physical condition would have deteriorated absent the defendant's conduct. That, coupled with the fact that the plaintiff failed to seek psychiatric help for his emotional distress, warrants some reduction of the jury award. I therefore order remittitur of $75,000, which reduces the award to $175,000. This is the maximum recovery that would not "deviate materially" from awards in cases with similar characteristics.

### 4. Passion and Prejudice

Finally, Icelandair moves for a new trial on the ground that the jury acted out of passion, sympathy, prejudice, or a desire to punish the defendant. This contention is purely speculative and is belied by the record. The defendant has failed to come forward with "persuasive evidence" of the jury's passion or prejudice. *See Earl*, 917 F.2d at 1327. "Based on his or her observation of the trial, the trial judge must determine whether the jury was impassioned or prejudiced against the defendants." *Smith v. City of Seven Points, Texas*, 608 F.Supp.

458, 465 (E.D.Tex.1985). Having observed the jury at trial and reviewed the record before me, I find no indication that this jury was so motivated.

Moreover, the jury rejected the plaintiff's claims of ethnic origin discrimination, retaliation, and willfulness. Further, it only awarded the plaintiff one out of three categories of compensatory damages. These findings indicate sober and careful consideration of evidence, rather than a rush to judgment based on sympathy or prejudice.

### B. *Motion for Reinstatement or Front Pay*

The plaintiff moves for reinstatement or, alternatively, for front pay. In requesting reinstatement, the plaintiff specifically asks the Court to order that Icelandair provide permanent staffing at JFK to ensure that he will not be required to answer all of the cargo department telephone lines; issue an announcement to its staff, its customers, and the airline industry stating that Mr. Shea has been reinstated with full authority for cargo sales and services in the Western Hemisphere; maintain Mr. Shea's pension and travel rights and other privileges; forbid employees from speaking Icelandic in Mr. Shea's presence in business or commercial matters; and submit any disputes between Icelandair and Mr. Shea regarding the conditions of his employment to a neutral arbitrator. Affidavit of Jeffrey C. Slade dated Jan. 16, 1996 ("Slade Aff.") ¶ 4.

■ The defendant opposes the plaintiff's motion for reinstatement on the ground that Mr. Shea's former position no longer exists. Icelandair also argues that reinstating him will require displacement of another employee. Finally, the defendant contends that Mr. Shea's health precludes his returning to his prior position.

The ADEA provides in relevant part that:

In any action brought to enforce this chapter the court shall have jurisdiction to grant such legal or equitable relief as may be appropriate to effectuate the purposes of this chapter, including without limitation judgments compelling employment, reinstatement or promotion[.]

29 U.S.C. § 626(b). Courts strongly favor reinstatement over alternative forms of relief. *Whittlesey v. Union Carbide Corp.*, 742 F.2d 724, 728 (2d Cir.1984); *Miano v. AC & R Advertising, Inc.*, 875 F.Supp. 204, 224 (S.D.N.Y.1995). However, reinstatement does not always afford a practicable remedy for either the plaintiff or the defendant. Specifically, reinstatement may not be feasible where (1) the position to which the plaintiff seeks to be reinstated has been changed or eliminated; (2) reinstatement would result in an innocent third party losing a job, or (3) the relationship between the parties has been severely damaged. *See, e.g., E.E.O.C. v. Century Broadcasting Corp.*, 957 F.2d 1446, 1462–63 (7th Cir.1992) (reinstatement denied where it would disrupt company's operation and displace currently employed radio announcers); *Blum v. Witco Chemical Corp.*, 829 F.2d 367, 373–74 (3d Cir.1987) (reinstatement not feasible due to great animosity between parties); *Whittlesey*, 742 F.2d at 728 (same); *see also Sandlin v. Corporate Interiors Inc.*, 972 F.2d 1212, 1215 (10th Cir.1992) (no reinstatement where employer ceased doing business); *Davis v. Combustion Engineering, Inc.*, 742 F.2d 916, 923 (6th Cir. 1984) ("substantial reductions in force and changed conditions at the defendant's plant due to a continued reduced demand for its products" militates against reinstatement).

#### 1. *Availability of Prior Position*

■ The defendant argues that reinstatement is impossible because Mr. Shea's old position no longer exists as a result of corporate restructuring. Specifically, it contends that after Jon Theodorsson assumed supervision of the cargo department, he did so under the title of "Director" of Cargo rather than under Mr. Shea's old title. Additionally, before Mr. Shea's demotion, his staff included Sigurdur Gundmundsson and clerical personnel. Currently, Mr. Gundmundsson is working from his home and in an office at Baltimore–Washington International Airport where he has been stationed for the past two years.

■ A court can grant reinstatement where a comparable job exists even if it bears a different title. *See Sinclair v. Insur-*

*ance Co. of North America,* 609 F.Supp. 397, 400 (E.D.Pa.1984) (reinstatement feasible where plaintiff's job title eliminated but duties delegated to others), *aff'd,* 782 F.2d 1031 (3d Cir.1986). Although Mr. Theodorsson assumed Mr. Shea's position under a new title, his duties are little different from those previously performed by Mr. Shea. (Tr. at 123–24). Further, it is immaterial that the position now receives less in the way of support services. Therefore, Mr. Shea can be reinstated to the position currently held by Mr. Theodorsson.

■ Icelandair further argues that reinstating Mr. Shea would disrupt the present company structure. When ordering reinstatement, the court can take into account an employer's flexibility in making personnel changes. *Bingman v. Natkin & Co.,* 937 F.2d 553, 558 (10th Cir.1991) (reinstatement ordered where court found flexibility in employee relations). The testimony in this case shows that Icelandair lacks a rigid corporate structure. For example, Sigfus Erlingson, Director of the Americas for Icelandair, testified that employees are routinely transferred for the purposes of enhancing their skills and experience within the company:

Q: ... You have had a number of positions at Icelandair, I should say. Is there any particular reason for that, the number of move[s] you have had, the number of different titles and positions you have had?

A: Well, there is a certain policy to, to change positions, particularly in the marketing field.

Q: Move people into different areas?

A: Yes.

Q: Is there an advantage perceived to the company by following such a policy?

A: Yes.

Q: And what is that advantage?

A: Well, it widens the work scope and people don't get, shall we say, settled down into an easy chair.

(Tr. at 428). Similarly, Sigurdur Helgason, Icelandair's president, testified that it was his philosophy to rotate employees:

A: It was kind of my philosophy if we have management people within the company they should be able to take over the tasks that they may be doing everyday so they can be moved from one department to [an]other, even though they haven't been doing that kind of job.

Q: So it is your understanding or your testimony that this regularly happens within the Icelandair organization?

A: It happens from time to time that we move people from one area to another.

(Tr. at 358–59). Thus, reinstatement would not cause disruption of company structure or operations in the present case.

Finally, the defendant argues that reinstatement of Mr. Shea would require displacing Mr. Theodorsson. Some courts have shown reluctance to displace or "bump" an innocent third party. *See, e.g., E.E.O.C. v. Century Broadcasting Corp.,* 957 F.2d at 1463. The Second Circuit has not spoken on the issue, but the plaintiff argues that this Court should reject any "no bumping" principle. However, I need not decide that issue here. Even those courts that have subscribed to the "no bumping" rule have made an exception where the equities in a particular case warrant it. *See Walters v. City of Atlanta,* 803 F.2d 1135, 1149 (11th Cir.1986) ("bumping" requires balancing of competing equities); *Lander v. Hodel,* Civ. A. No. 85–3833 (JGP), 1988 WL 122580, at *3 (D.D.C. Nov. 7, 1988) ("the Court has [ ] authority to order the reinstatement of an employee, and ... 'bump' anyone who may be occupying the slot in order to make the plaintiff whole"). In weighing the equities, the court may consider such factors as the uniqueness of the position denied to the plaintiff, the ability to minimize harm to the "bumped" employee, and the frequency of discriminatory acts. *Walters,* 803 F.2d at 1150.

Here, the equities weigh in favor of reinstatement. Mr. Shea has been an exemplary employee of Icelandair for more than thirty years. The position from which he was demoted is unique and has been shaped by Mr. Shea's work at Icelandair. Furthermore, reinstating Mr. Shea will not result in Mr. Theodorsson losing a job. He could still

remain in the cargo department and report to Mr. Shea. Moreover, his salary is currently lower than Mr. Shea's, and he therefore need not lose pay or benefits if he is displaced by the plaintiff. Alternatively, in accordance with the company policy of rotating employees, Mr. Theodorsson could return to the accounting department where he was previously assigned. In sum, the potential displacement of Mr. Theodorsson does not bar the plaintiff's reinstatement.

### 2. Mr. Shea's Health

■ The defendant also argues that Mr. Shea is too ill to perform the duties of his former position. The caselaw provides little guidance for determining when a plaintiff's health condition is serious enough to bar reinstatement. At least one federal court has considered a plaintiff's illness to be an impediment to his resuming his former duties. *See McCann v. Litton Systems, Inc.*, 767 F.Supp. 127, 130 (S.D.Miss.1991) (award of front pay rather than reinstatement was appropriate relief for successful ADEA plaintiff suffering from cancer), *rev'd on other grounds*, 986 F.2d 946 (5th Cir.1992).

■ However, reinstatement should be ordered where evidence demonstrates that the plaintiff is physically able to return to work. *Bingman*, 937 F.2d at 558. The plaintiff in this case testified that he is capable of performing his former duties (Tr. at 172), and this testimony was corroborated by two of his physicians. One of them, Dr. Robert E. Barrett, wrote to Mr. Theodorsson that "Mr. Alfred Shea can perform his duties as District Sales Manager of Cargo as they have been outlined to me by Mr. Shea." Letter of Robert E. Barrett, M.D. to Jon Theodorsson dated May 18, 1995 attached as Exhibit A to the Plaintiff's Reply Memorandum of Law In Further Support of Plaintiff's Motion for Reinstatement or Front Pay. Additionally, Dr. Strachovsky testified that Mr. Shea is fit to perform his duties with the exception of the responsibility for answering multiple phone lines. Dr. Strachovsky stated, "The only part of the job [Mr. Shea] complained about was being in a situation of so many phones ringing at one time without additional help. From what he told me and related to me, it sounded like any person,

whether stressed or not, would be stressed under those conditions." (Tr. at 317). Otherwise, according to Dr. Strachovsky, Mr. Shea could perform his job:

Q: Did you feel he was physically able to work at that point in time?

A: He appeared to be physically able to work, yes.

(Tr. 312–13).

Q: At this point in time the letter was drafted on October 26[, 1995]. Had you instructed Mr. Shea not to attend work, not to work?

A: I don't believe so.

Q: Did you feel he was physically capable of returning to work at that point in time?

A: Yes.

(Tr. at 321).

■ Moreover, where reasonable arrangements can alleviate health problems of an employment discrimination plaintiff, the court should order reinstatement. *Quicker v. American V. Mueller*, 712 F.Supp. 824, 829 (D.Colo.1989). In *Quicker*, the court ordered reinstatement of a plaintiff suffering from ventricular tachycardia on the condition that he could cover some of his sales territory through telemarketing. *Id.* Reasoning that the plaintiff could adequately perform his job despite his handicap, the court concluded that accommodating the plaintiff in this way would constitute a just and reasonable term of reinstatement. *Id.*

Based on the trial record, I find that Mr. Shea's health is not an impediment to his reinstatement provided that certain conditions are met. It is imperative that the stress associated with Mr. Shea answering multiple telephone lines by himself be eliminated by any effective method that the defendant chooses. *See Quicker*, 712 F.Supp. at 829–30 ("Stressful travel to the other outlying accounts in the Denver-based territory as now constituted has the potential for provoking in Plaintiff additional attacks of ventricular tachycardia. Thus a just and reasonable term of reinstatement and accommodation is that Plaintiff be allowed to cover such outlying accounts in whole or in part by telemark-

eting."). Elimination of this duty will not be an unreasonable condition of Mr. Shea's reinstatement, especially because Mr. Shea's responsibilities prior to his demotion did not include this component.[5]

### 3. *Postverdict Hostility*

The defendant does not contest reinstatement on the ground that hostility between parties bars reinstatement. However, I address this issue briefly because the plaintiff maintains that following the jury's verdict he encountered antipathy on the part of the defendant. *See* Slade Aff. ¶¶ 13–17.

The court may deny reinstatement where the relationship between the employer and the aggrieved employee is characterized by antagonism, spite, or lack of trust. *Flores Cruz v. Avon Products, Inc.*, 693 F.Supp. 1314, 1324 (D.P.R.1988); *Combes v. Griffin Television, Inc.*, 421 F.Supp. 841, 846 (W.D.Okla.1976). For example, one court found that reinstatement was inappropriate where the plaintiff's "illicit sexual affair" with her supervisor generated great animosity in the department. *Shore v. Federal Express Corp.*, 589 F.Supp. 662, 668 (W.D.Tenn.1984), *aff'd and remanded in part*, 777 F.2d 1155 (6th Cir.1985). Furthermore, reinstatement may be impracticable where hostility and lack of cooperation will jeopardize the safety of other employees or the public at large. *See Hopkins v. City of Jonesboro*, 578 F.Supp. 137, 142 (E.D.Ark.1983) (reinstatement denied to discharged policewoman because of need for police officers to rely on one another to protect public safety).

Hostility sufficient to bar reinstatement, however, is distinct from the natural discomfort that may arise out of employment discrimination litigation. It is not unusual for the parties to encounter some antagonism as a result of such litigation. Nevertheless, "[t]hat is not to say that reinstatement is impossible whenever friction arises in a litigation. Preclusion of reinstatement due to such tensions that are the 'natural bi-product [sic] of any litigation' would be incompatible with the remedial scheme of the antidiscrimination laws." *Miano*, 875 F.Supp. at 225; *see also Blake v. J.C. Penney Co.*, 706

F.Supp. 679, 682 (W.D.Ark.1988) (inevitable friction caused by litigation and employee's fear of retribution do not bar reinstatement), *aff'd in part and rev'd in part*, 894 F.2d 274, 282 (1990).

In this case, the only evidence of Icelandair's alleged hostility is the plaintiff's allegation that Icelandair erroneously designated his continuing absence as "sick time." Slade Aff., ¶ 15, Exh. F. The plaintiff contends that he was absent because of Icelandair's failure to provide him with reasonable accommodations. Slade Aff., ¶ 15. Clearly, this amounts at most to post-litigation friction and does not rise to a level of acrimony that would prevent reinstatement.

### 4. *Requested Conditions*

In awarding reinstatement or front pay the court exercises its broad equitable powers. "In determining the appropriate order for relief [under the ADEA], the court can consider taking into further account extraordinary equitable circumstances that affect the legitimate interests of either party." *McKennon v. Nashville Banner Pub. Co.*, — U.S. —, —, 115 S.Ct. 879, 886, 130 L.Ed.2d 852 (1995). This case presents circumstances that call for a more elaborate order of relief than normally is warranted. Specifically, in order to make the plaintiff whole in the present case, this Court must order the defendant to reinstate the plaintiff and take reasonable steps to accommodate him in returning to his pre-demotion position. I have already discussed the problem of multiple telephone lines, and I now proceed to the remainder of the plaintiff's requested conditions.

First, reinstatement means that the employment discrimination plaintiff is returned to the same position as if he had never been subject to adverse employment action. This includes restoration of any benefits that would have accrued from uninterrupted employment. *See Brown v. M & M/Mars*, 883 F.2d 505, 515 (7th Cir.1989). Thus, Icelandair must ensure that Mr. Shea

---

**5.** The rest of the conditions of reinstatement requested by the plaintiff are discussed below.

reacquires any pension and travel rights that were adversely affected by his demotion.

 However, I will not order Icelandair to issue an announcement to its staff, customers, and others in the airline industry regarding Mr. Shea's reinstatement. The defendant will presumably notify such persons in any event in order to avoid confusion in its business operations. It would be better, therefore, to leave the logistics of such notification to Icelandair.

 Similarly, I will not enjoin Icelandair employees from speaking Icelandic in Mr. Shea's presence. The nexus between these incidents and any claim of age discrimination is tenuous. Moreover, once Mr. Shea assumes his old position as the head of the Cargo Department he will necessarily be included in all department transactions. Thus, his complaint of linguistic exclusion will be moot.

Finally, appointment of an independent arbitrator is not warranted. This Court has power to enforce its decisions and sanction parties that do not comply with its orders. Therefore, appointment of an arbitrator would be redundant. Additionally, the parties are encouraged to resolve their disagreements amicably, and introduction of a third party into these disputes would be counterproductive.

Because I grant the plaintiff's motion for reinstatement, the issue of front pay is rendered moot.

*Conclusion*

For the reasons stated above, the defendant's motion for new trial is denied upon the condition that the plaintiff accept remittitur in the amount of $75,000, thereby reducing the damage award to $175,000. The plaintiff's motion for reinstatement is granted. Mr. Shea shall resume his prior position, his travel and pension benefits shall be restored, and he shall be relieved of exclusive responsibility for answering telephones in the cargo department. Counsel shall submit a proposed judgment on notice.

SO ORDERED.