**Adrienne GATTI, Plaintiff,**

v.

**COMMUNITY ACTION AGENCY OF GREENE COUNTY, INC. and Edward Daly, Individually and in his capacity as Executive Director of Community Action Agency of Greene County, Inc. Defendants.**

No. 98–CV–1602 (RFT).

United States District Court, N.D. New York.

May 19, 2003.

---

Kevin G. Martin, James W. Hyde, IV, Kernan, Kernan Law Firm, Utica, NY, Patricia G. Schneider, Schneider, Sacco Law Firm, Cairo, NY, for Plaintiff.

Susan F. Bartkowski, James T. Towne, Jr., Towne Law Firm, Albany, NY, for Defendants.

### MEMORANDUM DECISION AND ORDER

TREECE, United States Magistrate Judge.

Plaintiff, Adrienne Gatti ("Gatti"), brought this action pursuant to the Federal Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621 *et seq.*, and New York State Human Rights Law ("NYHRL") N.Y. Exec. Law § 296, alleging that the Defendants, Community Action Agency of Greene County, Inc. ("Community Action") and Edward Daly ("Daly"), Executive Director, unlawfully terminated her and subjected her to a hostile working environment because of her age. The case was tried before a jury, commencing on October 25, 2002. On November 1, 2002, the jury returned a verdict in favor of Gatti, awarding her $181,761.00, as compensation for lost wages, both back and front pay, as well as emotional distress or mental anguish caused by the unlawful termination.[1] A judgment was entered by this Court on the verdict on November 4, 2002. Dkt. No. 68.

Both parties have made post-trial motions. Defendants now move, pursuant to Fed. R. Civ. P. 50(b) for a judgment as a matter of law directing a verdict in their favor or, in the alternative, for a new trial pursuant to Fed. R. Civ. P. 50(b), 50(c), and 59(a). Dkt. No. 69. Defendants further request, pursuant to Fed. R. Civ. P. 59(e), the Court alter or amend the judgment to strike the award of costs to Plaintiff or, in the alternative, apportion the award of costs between Plaintiff and Defendants. *Id.* Plaintiff opposes the motions and has also moved, pursuant to the ADEA, for attorney fees, and for both pre-judgment and post-judgment interest. Dkt Nos.73–75. Similarly, the Defendants oppose Plaintiff's motion for attorney fees. Dkt. No.

---

**1.** References to the trial transcript ("Tr.") are made throughout this opinion.

82. For the reasons set forth below (1) Defendants' motion for judgment as a matter of law is **denied**; (2) Defendants' motion for a new trial is **denied**; (3) Defendants' motion to alter or amend the jury's apportionment of costs is denied; (4) Gatti's motion for attorneys' fees and costs is **granted as modified**; and (5) Gatti's motion for pre-judgment and post-judgment interest is **granted as modified**.

## I. BACKGROUND

### 1. Factual Summary

Community Action Agency of Greene County, Inc. located in Catskill, New York administered several programs, one of which was a federally funded Head Start Program. Another program administered by Community Action was the Day Care Center, which was independent of the Head Start Program. Adrienne Gatti, who was born on January 13, 1938, was first hired by Community Action on September 18, 1978. From this date until her termination in July 1998, Gatti held various positions. She was initially hired as an Executive Secretary but over the next twenty years she served as Personnel Director, Day Care Director, and Head Start Administrative Coordinator.

For most of her employment with Community Action, Gatti's primary supervisor was Iva Woodford, who was the director of the Head Start Program. Because Head Start is federally funded, this program had to be conducted in accordance with federal guidelines. Although Community Action was the grantee and received the money to operate this program, these applicable federal requirements directed that a parent community-based policy council work with Community Action to implement the major decisions affecting the Head Start Program. Those major decisions included hiring, firing, promotions, and preparing job descriptions and yearly budgets.

In 1996, Community Action hired Edward Daly as Executive Director of Community Action and empowered him with the mandate to revamp the agency's infrastructure and bring the Head Start Program into compliance with the federal guidelines. It is not certain when they occurred, but significant rifts developed between: the Policy Council and Community Action; members within the Policy Council; and Community Action and the Head Start Program's employees. There existed a huge divide among all with each pointing the finger at the other for the problems. Eventually all of these conflicts festered and became inextricably and irretrievably intertwined. The disturbing chasm between management and employees engulfed the Policy Council which exhibited fragmented loyalty to both. Some members of the Policy Council refused to vote on various issues. There were work stoppages and charges of a "lock out." The imbroglio became so caustic that at one juncture there were two independent Policy Councils attempting to manage this Head Start Program. Matters became so grave that the Department of Health and Human Services had to intervene into this fray. The funding for this Head Start Program was imperiled and ultimately, in 1998, federal funds were transferred from Community Action to a Warren–Washington County Agency to oversee the operations of this program. All of the Head Start employees were terminated but eventually most, if not all, were re-hired in 1999, except Gatti, once Warren–Washington County was prepared to operate the program. Gatti was offered a position within another Community Action program but for a reduction in her salary. Her employment with Community Action terminated in July 1998.

### 2. Procedural History

The Plaintiff brought this action on October 13, 1998, against Community Action

and Edward Daly for violation of ADEA and NYHRL. Dkt. No. 1. Gatti complained that once Daly became Executive Director in 1996 until she was terminated in 1998, he conducted a severe and pervasive discriminatory campaign against her by, *inter alia:* (1) decreasing her salary as Administrative Coordinator; (2) attempting, then eventually, eliminating her position due to her age; (3) creating a hostile working environment due to her age; (4) frequently demeaning her, at times in the presence of others, about her age; (5) continually withdrawing, compromising or minimizing her duties and responsibilities as Administrator Coordinator; and (6) reducing her salary when others' salaries were not similarly reduced. Her theories of liability were discrimination premised upon age, retaliation, and a hostile working environment.[2] A Motion to Dismiss the Complaint was granted by District Judge Lawrence E. Kahn on February 7, 2000. Dkt. Nos. 11 & 12. However, on March 14, 2001, the Circuit Court of Appeals for the Second Circuit vacated the dismissal order and remanded in accordance with its order. Dkt. No. 16, slip op. dated Feb. 16, 2001. Within its order, the Second Circuit found that Gatti's Complaint was sufficient enough to overcome a FED. R. CIV. P. 12(b)(6) motion. *Id.* On October 2, 2002, District Judge Lawrence E. Kahn signed an order referring the case on consent to this Magistrate Judge. Dkt. No. 35.

A jury trial commenced on October 25, 2002. Approximately a week later, on November 1, 2002, the jury returned a verdict in favor of Gatti in the amount of $181,761.00. The jury found against both Defendants on all of her causes of action and awarded her back and front pay in the amounts of $57,453.00 and $44,308.00 respectively, and further awarded her for past emotional distress and mental anguish in the amount of $80,000.00. Dkt. No. 57, Special Verdict Form.

## II. DISCUSSION

Defendants assert six separate grounds in support of their motion to set aside the verdict or for a new trial: 1) An improper age-based hostile work environment charge was given to the jury; 2) Plaintiff's expert was improperly allowed to testify about opinions not contained within the disclosed report; 3) Plaintiff's expert generated a second report that was not disclosed prior to trial thereby prejudicing Defendants; 4) Plaintiff's expert's initial report should have been excluded as it was unrealistic and ignored pertinent facts; 5) the jury's pain and suffering award was unreasonably high; and 6) there was no legally sufficient evidentiary basis for the jury's verdict. Dkt. Nos. 69, 70, 72.

### 1. Standard of Law To Be Applied

### (a) Judgment as a Matter of Law

According to FED. R. CIV. P. 50(a), a party must move for judgment as a matter

---

**2.** Daily's other conduct towards Gatti which contributed to a hostile working environment included, but not limited to:
 (1) indicating to Gatti and others that her position would be eliminated due to her age;
 (2) at meetings being condescending, hostile, and rude and indicating that her employment was in jeopardy due to her age;
 (3) indicating to others and Gatti that she was not young enough to be retrained and that it was time for her to go;

 (4) screaming at her in front of others to take the cotton out of her ears or turn up her hearing aid;
 (5) stating to her that if she was too old to get with the program she would be out the door or that there was no room for dead weight;
 (6) referring to her as an old lady when speaking with others;
 (7) her job evaluations changed markedly for the worst.

of law prior to the submission of the case to the jury. *See* FED.R.CIV.P. 50(a)(2). If the motion is denied, it may be renewed within ten days after the entry of judgment. *See* FED.R.CIV.P. 50(b). Defendants complied with these requirements and therefore the motion is properly filed. Tr. at at 532–40.

■ A court may render a judgment as a matter of law when "a party has been fully heard on an issue and there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue...." FED. R. CIV. P. 50(a)(1); *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 149, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000). The Second Circuit has established the standard for granting judgment as a matter of law wherein

> the trial court cannot assess the weight of conflicting evidence, pass on the credibility of the witnesses, or substitute its judgment for that of the jury. Rather, after viewing the evidence in a light most favorable to the non-moving party (giving the non-movant the benefit of all reasonable inferences), the trial court should grant a judgement n.o.v. only when (1) there is such a complete absence of evidence supporting the verdict that the jury's findings could only have been the result of sheer surmise and conjecture, or (2) there is such an overwhelming amount of evidence in favor of the movant that reasonable and fair minded men could not arrive at a verdict against him.

*Mattivi v. South African Marine Corp., "Huguenot"*, 618 F.2d 163, 167–68 (2d Cir. 1980) (cited in *Dewing v. Orkin Exterminating Co., Inc.*, 897 F.Supp. 44, 46

(N.D.N.Y.1995); [3] *see also Samuels v. Air Transport Local 504*, 992 F.2d 12, 14 (2d Cir.1993); *Mallis v. Bankers Trust Co.*, 717 F.2d 683, 688–89 (2d Cir.1983). Thus, in ruling on such a motion, the essential steps for the trial court is to "consider the evidence in the light most favorable to the party against whom the motion was made and to give that party the benefit of all reasonable inferences that the jury might have drawn in his favor from the evidence." *Tolbert v. Queens Coll.*, 242 F.3d 58, 70 (2d Cir.2001) (cited in *Shannon v. Fireman's Fund Ins. Co.*, 156 F.Supp.2d 279, 287 (S.D.N.Y.2001).

### (b) Motion for a New Trial

■ A less stringent standard applies to motions for a new trial pursuant to Rule 59(a). "A trial court should grant such a motion when convinced that the jury has reached a seriously erroneous result or the verdict is a miscarriage of justice." *Katara v. D.E. Jones Commodities, Inc.*, 835 F.2d 966, 970 (2d Cir.1987) (cited in *Dewing v. Orkin Exterminating Co., Inc.*, 897 F.Supp. at 47). A trial judge's disagreement with the jury verdict is an insufficient basis for granting a new trial. *Mallis v. Bankers Trust Co.*, 717 F.2d at 688–89. The Second Circuit has articulated the standard as follows:

> The trial judge, exercising a mature judicial discretion, should view the verdict in the overall setting of the trial; consider the character of the evidence and the complexity or simplicity of the legal principles which the jury was bound to apply to the facts; and abstain from interfering with the verdict unless it is quite clear that the jury has reached a seriously erroneous result. The judge's

---

**3.** In *Dewing,* the Court noted that the 1991 amendments to FED. R. CIV. P. 50 "abandoned the terms 'directed verdict' and 'judgment notwithstanding the verdict' in favor of the encompassing 'judgment as a matter of law'

terminology. The standard for granting the motions was not altered. *See* FED. R. CIV. P. 50 Advisory Committee's note, 1991 Amendment." *Dewing,* 897 F.Supp. at 46.

duty is essentially to see that there is no miscarriage of justice. If convinced that there has been then it is his duty to set the verdict aside; otherwise not.

*Bevevino v. Saydjari,* 574 F.2d 676, 684 (2d Cir.1978) (quoting 6A J. Moore, *Moore's Federal Practice,* ¶¶ 59.08[5], at 59–160 through 59–161 (1973)). Unlike a judgment as a matter of law, a judge may grant a new trial even if there is "substantial evidence to support the jury's verdict." *Song v. Ives Labs., Inc.,* 957 F.2d 1041, 1047 (2d Cir.1992). However, where the resolution of the issues turns on the credibility of the witnesses, "it is proper for the court to refrain from setting aside the verdict and granting a new trial." *Metromedia Co. v. Fugazy,* 983 F.2d 350, 363 (2d Cir.1992).

### 2. Defendants' Motions and Objections

#### (a) Age-based Hostile Working Environment Charge

The jury considered a cause of action premised upon an age-based hostile working environment and found that the Plaintiff had proven by a preponderance of the evidence that Community Action and Daly created such a hostile working environment. Dkt. No. 57, p. 6 (question 5). Defendants contend that the Plaintiff's Complaint did not include a cause of action for age-based hostile working environment and that such a cause of action was interjected into this lawsuit for the first time when the Plaintiff presented to the Court proposed instructions of law days prior to the trial. Dkt. No. 70. They further contend there was no discovery on this claim, that Plaintiff's counsel represented at a deposition that this claim was not present within this lawsuit, and there was no mention of this cause of action during voir dire. *Id.* If Plaintiff wanted to present this cause of action to the jury, she should have made a motion to amend pursuant to FED. R. CIV. P. 15(a). *Id.* With no such motion being made or considered by the Court, presenting such a cause of action to the jury was prejudicial. *Id.*

When the Defendants first raised this issue just prior to the commencement of the trial, Plaintiff's counsel vigorously denied they represented to the Defendants that this cause of action was not included in this claim and further asserted that the cause of action is clearly set forth in the Complaint.

It is established black letter law that the cause of action of hostile working environment in a Title VII claim, 42 U.S.C. § 2000e *et seq.,* is viable. *Brennan v. Metropolitan Opera Assn.,* 192 F.3d 310, 318 (2d Cir.1999) (citing *Harris v. Forklift Systems, Inc.,* 510 U.S. 17, 21, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993)); *see also Alfano v. Costello et al,* 294 F.3d 365 (2d Cir.2002). So too is this true with regard to ADEA types of actions and they as well are subjected to same analysis as Title VII. *Brennan v. Metropolitan Opera,* 192 F.3d at 318 (citing *Crawford v. Medina Gen. Hosp.,* 96 F.3d 830, 834 (6th Cir. 1996)).

■ In determining whether such a cause of action exists in this litigation, the Court must, as it did when the issue was initially raised immediately prior to and during the trial, review the four corners of the Complaint.[4] Dkt. No. 1; *see* Tr. at 32–3, 536. The "four corners of the com-

---

**4.** It should be clear that the Defendants are not presently claiming that the Plaintiff's allegation of age-based hostile working environment was "not strong enough to stand on its own." Dkt. No. 87, p. 1. This is in contrast to Defendants' position before the commencement of trial however. *See* Dkt. No. 65, p. 1 ("Claims rooted in an age-based hostile work environment are not recognized by either the Court of Appeals for the Second Circuit or the Northern District of New York.").

plaint" includes any attached documents specifically referenced to and incorporated into the complaint. A cautious inspection of the Complaint and the attached affidavit of Gatti, which is an integral component of the Complaint, reveal that sufficient facts were plead to sustain or reasonably infer a cause of action for hostile working environment based upon age. References to hostile working environment set forth in all of the documents that comprised the Complaint indicate an interconnection with other allegations of age discrimination to reasonably infer subjectively and objectively this claim:

! "I have been continually harassed by Mr. Daly including in June 1, 1998 .... As a result of the age discrimination and retaliation ..." Compl. at ¶ 13;

! " ... Mr. Daly was extremely hostile, making condescending comments like 'I don't care what you have to say' ...." Aff. at ¶ 9;

! "That I met formally with Mr. Daly and he was again extremely condescending and hostile making numerous comments as to my evaluations and work habits .... He indicated that I was in jeopardy of being fired due to my age." Aff. at ¶ 10;

! " ... In addition, he screamed at me and told me to take the cotton out of my ears and understand what he was telling me." Aff. at ¶ 11;

! "That because of his demeaning comments about my age and abilities, about my being in the agency too long, I filed a complaint in Greene County Supreme Court .... That after filing suit and continually up through present, I have been harassed by Mr. Daly by and through persons working at his requests...." Aff. at ¶¶ 14 & 20.

A prima facie cause of action of hostile working environment is clearly evident and sufficiently detailed in the Complaint even though it is not independently stated from Gatti's other causes of action. Additionally, the Defendants' challenge to this cause of action being submitted to the jury is without merit. In a companion case, these litigators were confronted with this identical issue. The Second Circuit analysis of this issue is instructive if not controlling.

Theresa Gregory ("Gregory") brought an action against our Defendant, Edward Daly, for Title VII violations that included quid pro quo, retaliation, and hostile working environment almost simultaneously with this lawsuit. Gregory appealed an order of dismissal granted by District Judge Lawrence E. Kahn to the Second Circuit. *Gregory v. Daly*, 243 F.3d 687, 698–700 (2d Cir.2001). The facts and allegations against Daly are eerily similar to our litigation with the exception of sex and gender substituted for age, and the complaint therein was plead in a similar fashion as done in this case. The Second Circuit found that Gregory had adequately stated a cause of action for hostile working environment.

Addressing whether such a cause of action must be stated separately, the Second Circuit noted

that traditional categories of "hostile work environment" and "quid pro quo" harassment do not reflect statutory proscriptions that separate "harassment" from other forms of discrimination. Rather, the high Court has indicated that these labels, to the extent that they are useful at all, are so merely as descriptions of varying workplace conditions that violate Title VII's basic prohibition on sex discrimination in terms or conditions of employment. *See Burlington Indus.*, 524 U.S. at 751–52, 118 S.Ct. 2257, 141 L.Ed.2d 633; *Oncale*, 523 U.S. at 78–81, 118 S.Ct. 998, 140 L.Ed.2d 201. Indeed, in *Burlington Industries*, the Court gave primary importance only to

one distinction, namely that between employer conduct that leads to tangible employment actions and the more informal imposition of adverse terms or conditions of employment that result in a hostile or abusive workplace. *See Burlington Indus.*, 524 U.S. at 751–53, 118 S.Ct. 2257, 141 L.Ed.2d 633; *see also Mosher v. Dollar Tree Stores, Inc.*, 240 F.3d 662, 666 (7th Cir.2001).

*Id.* at 698.

To reiterate this very point, the Second Circuit continued by observing

the law does not create separate causes of action for sex discrimination .... What matters, instead, is simply whether an employment action was based on plaintiff's sex .... As a result, a plaintiff seeking to demonstrate sex discrimination is not required to disentangle various threads that, after all, need not have a separate existence, given that various forms of discrimination may well co-exist in a workplace.

*Id.* at 698–99.

Therefore, since ADEA actions are subject to the same analysis as Title VII, *Brennan v. Metropolitan Opera*, 192 F.3d at 318, *a fortiori*, the *Gregory* ruling is applicable to this age discrimination case. No specific delineation in a complaint is then required for hostile working environment as long as sufficient facts have been plead to support such a charge and the plaintiff's allegations have an interconnection symptomatic of age-based hostility. It is important to note that the issue of whether hostile working environment would be submitted to the jury was addressed early in the trial—prior to opening statements. It was vigorously argued then as now. *See* Dkt. No. 65. This Court

analyzed the pleadings and the circumstances at that juncture and determined that indeed the Plaintiff had preserved the theory of hostile working environment. Tr. at 32–3. Even though a formal motion was not made by the Plaintiff, the Court can, and in essence did, orally conform the pleading to the evidence. FED. R. CIV. P. 15(b) permits an amendment

[i]f evidence is objected to at the trial on the ground that it is not within the issues made by the pleadings, the court may allow the pleadings to be amended and shall do so freely when the presentation of the merits of the action will be subserved thereby and the objecting party fails to satisfy the court that the admission of such evidence would prejudice the party in maintaining the party's actions or defense upon the merits.

Further, at the conclusion of the proof, this Court found that there was no surprise or prejudice to the Defendants and a prima facie case was properly submitted to the jury.[5] Tr. at 536.

During the trial, the Defendants vigorously challenged every fact presented by the Plaintiff in support of each of her claims, which were in essence the same facts and allegations plead in the Complaint and attached affidavit. They had every opportunity during summation to argue that there was no hostile working environment under the totality of these circumstance and clearly that was the inference of their arguments. They certainly argued, *inter alia*, there was no proof on any of the causes of action and that the lawsuit was "mere contrivance." Tr. at 558. Indeed, the Court's conclusion that there was neither surprise nor prejudice to the Defendants is confirmed.

---

**5.** FED. R. CIV. P. 15(b) allows the court to grant a continuance of the trial to enable an opposing party to meet such evidence. Such an application was never made by the Defendants.

■ Moreover, once a case has been fully tried on its merits, a question whether the plaintiff has established a prima facie case becomes moot. *Ottaviani v. State Univ. of New York*, 875 F.2d 365, 373 (2d Cir.1989). All that remains is whether the Plaintiff met her burden and proved hostile working environment. *Id.* And in this matter, that burden was fulfilled. Ironically, the Defendants do not directly challenge the jury's findings on this cause of action on any ground, such as the insufficiency of the evidence, thereby obviating a need for this Court to analyze the proof on this claim. Dkt. No. 65 (Defendants do not claim that the "allegation of age-based hostile work environment was not strong enough to stand on its own."). In fact, the Defendants do not contest the jury's decision on any of the causes of action under ADEA and NYHRL for lack of proof. In essence, Defendants disagree with the verdict and further complain of being prejudiced by the impact of certain decisions made by this Court at trial. Dkt. No. 70, pp. 11–13. Therefore, the Defendants motion to set aside the verdict or a new trial on this issue is denied.

### (b) Plaintiff's Economist's Opinion [6]

■ As a part of her claim for age discrimination, Gatti sought back and front pay as damages. Her request for back pay would accrue upon her termination in July 1998 and include the period ending

with the jury deciding the issues of this case, and front pay, if a viable claim, would cover the balance of her work life expectancy. To support her claim for these damages, she presented William Blanchfield who possesses a Ph.D in economics. Tr. at 244–298. The Defendants attack Blanchfield's conclusions, for whatever little value they had, on two grounds, which appear on their face to be inimical to each other. First, they argue that the Plaintiff's expert should not have been permitted to testify beyond the scope of his disclosed expert report and second, the Plaintiff's initial disclosed report should not have been admitted because it did not make reasonable assumptions of the facts. Dkt. No. 70, Points II and III.

It appears that Plaintiff served her Economist's report on or before January 7, 2002, with the Defendants disclosing their expert report on January 7, 2002. Neither expert report was amended or supplemented prior to trial. Defendants however were prepared to assault the "disturbingly" flawed assumptions and conclusions set forth in Blanchfield's report at trial of which they gave some prior notice to the Plaintiff. Dkt. No. 87, pp. 2–4 (Point II). In their post-trial memorandum of law, the Defendants go to great length to point out to the Court, at this late juncture, each and every defect in Blanchfield's **initial** report. Dkt. No. 70, pp. 7–8. In fact, these same arguments were the bases of

---

**6.** It should be noted that the Defendants are not challenging the jury's award of back and front pay. Their objections pertain solely to the Plaintiff's economist's report and testimony being introduced into evidence. Nonetheless, awards for back and front pay are clearly authorized by ADEA and NYHRL. *See Haskell v. Kaman Corp.*, 743 F.2d 113, 120–21 (2d Cir.1984). A plaintiff who has proven an ADEA claim is entitled to back pay from the date of discharge until the date of the judgment. *Kirsch v. Fleet St., Ltd.*, 148 F.3d 149, 167 (2d Cir.1998). ADEA further permits a

district court to fashion equitable remedies which can include front pay for the loss of future earnings (*Padilla v. Metro–North Commuter R.R.*, 92 F.3d 117, 125–26 (2d Cir. 1996)), and court may receive an advisory verdict from a jury on the issue of front pay (*Hogan v. General Elec. Co.*, 144 F.Supp.2d 138, 144 (N.D.N.Y.2001). In this matter, the jury has returned an award of $57,453 for back pay and $44,308 for front pay, which this Court accepted. Dkt. No. 57. Defendants, however, challenge the award for emotional distress. *See infra*, Part I'd.

the their highly successful cross examination of Blanchfield. Tr. at 260–298. This Court does not find it necessary or see any utility to list now each and every defect since this issue is moot. That is, the economist's initial report with the exception of the curriculum vitae was stricken from the joint-stipulated exhibits with a curative instruction from this Court. *See* ex. P–52; Tr. at 304–318.

Prior to Blanchfield's testimony, the Defendants never attacked the expert's initial report nor sought to have it precluded as an exhibit, and to seek its preclusion at this late date seems particularly peculiar since the Defendants were rather aggressive in challenging a host of other issues before trial, but never a mention of their concerns with Blanchfield's initial report.[7] They could have readily availed themselves of several pre-trial remedies, provided by both statutory and case law, to preclude the entry of this report. *See* FED. R. CIV. P. 37; see also *Daubert v. Merrell Dow Pharmaceuticals Inc.,* 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993); *Frye v. United States,* 293 F. 1013 (D.C.Cir. 1923). They did not. In fact, the Defendants initially stipulated to the admission of this report. Dkt. No. 59. The transparent reason why Defendants did not move to strike the report prior to Blanchfield taking the stand is because they were laying and waiting to unleash a devastating cross examination, which in fact occurred. Defendants are now bound by the repercussions of that strategic election. For the Defendants to now raise that this report should have been excluded before Blanchfield's testimony smacks of the benefit of hindsight and is reprehensibly specious. Defendants, however, raised striking the report after, and only after, Dr. Blanchfield's testimony. Tr. at 304–09.

The report was stricken from the record. The Court did not accept the Defendants' arguments in total at the time but saw other reasons why the report should not be considered by the jury. Those reasons will be set forth below. The Court withdrew from Exhibit 52 the expert's report and permitted only the curriculum vitae and a statement of his experiences to remain. Tr. at 310–12. The curative instructions were

> P–52 is the economic report, Dr. Blanchfield, if you'll remember his report and you'll recall that there was testimony with regards to back pay and front pay and with the calculation of present value. There is within the report different numbers that we do not want you to be confused about. So what we're going to do is, we're going to redact P–52, we're going to take out that portion that deals with the calculations, so that you are least have, for the plaintiff, one set of numbers for your consideration, not what's in the report. We will do that at our next break, but what we'll be left with is the curriculum vitae, the experience in terms of evaluating cases, but the actual calculations will be changed. It is the Court's recollection, but it will be your recollection that controls, that the back pay was [$]58,984 -or I take that back. Back pay was $93,811; and present value of future pay was

---

7. For example, the Defendants filed an order to show cause to strike portions of the Plaintiff's Complaint or preclude testimony of Iva Woodford and two letters dated November 23, 1996 and December 20, 1996. Dkt. Nos. 37 & 38. They filed a motion in limine regarding Daily's criminal and employment rec-

ord. Dkt. No. 65. There were proposed jury instructions and a trial brief presented on their behalf. Dkt. No. 47, 62–64. They even filed a memorandum of law in opposition to the Plaintiff's proposed jury instruction on hostile working environment. Dkt. No. 65.

[$]58,984. The total is [$]152,795.[8] Tr. at 318–19. Therefore, the jury ignored the written report and reflected solely on Blanchfield's testimony, if at all.

Expert reports were exchanged on or before January 7, 2002, approximately eleven months prior to trial. Even though the Defendants' expert report noted several defects in the Plaintiff's report, based upon this alone, the Plaintiff's were not obligated to change the report. If Gatti wished to go forward with challenged assumptions and methodology, it was surely the Plaintiff's prerogative. Since the reports were exchanged earlier in 2002, neither of the competing experts had the Plaintiff's income tax figures for 2001 and income earned in 2002. Further, the receipt of unemployment was not available, which, when evaluated, substantially decreased the amount of the prospective damage. All of this new information, actually worked to the Defendants' advantage. Apparently, Dr. Blanchfield was not presented with this information until he took the stand on October 29, 2002, the third day of the trial, therefore he could not have submitted a revised report. It was not a surprise to the Court, and there should not have been any surprise to the parties, that calculations of damages for both of these years and the significance of receiving unemployment insurance during the relevant years would be relevant for the jury's assessment of damages. It is not infrequent that economists are asked during trial to review new and additional information and to adjust accordingly their calculations upon the facts that are a part of the record. Once again, the Defendants stipulated to this new tax information be-

ing presented to the jury without any objection prior to Blanchfield's testimony. Dkt. No. 59, Ex. P–58 & P–59. Notwithstanding, Defendants were given ample opportunity to cross examine as to what was provided in the original expert disclosure and what impact this new information would have. Tr. at 249. The Court did not find that this new information was so dramatic that it would imperil the Defendants' defense. To the contrary, the introduction of this information impacted unfavorably on the Plaintiff's case. Therefore the charge that they were prejudiced is misplaced.

The Defendants had other benefits which the Plaintiff did not have. The Defendants' expert, Edward Sealing, sat through Blanchfield's entire testimony. Tr. at 475. Sealing assisted the Defendants' attorney throughout the cross examination of Blanchfield and had more than a day to revise his calculations to be presented to the jury. In fact, Sealing's new calculations were presented to the jury on a sophisticated computer slide show and additional exhibits to support his opinion were accepted into the record. *See* Ex. D–45 & D–46. Furthermore, Sealing's testimony (Tr. at 458–531) superbly supported all of the points scored by the Defendants during their cross examination of Blanchfield's miscalculations of: (1) the impact of 401(k) calculation on taxable income (Tr. at 265–270); (2) the receipt of unemployment benefits (Tr. at 272); (3) depreciation of fixed assets (Tr. at 276–280); (4) social security benefits (Tr. at 284); (5) business expenses (Tr. at 288);

---

**8.** Dr. Blanchfield's initial report claimed that Plaintiffs back and front pay was $222,523. Tr. at 263. Significant reductions to this initial amount, *inter alia,* were due to the economist's erroneous assumptions, which the Defendants, during cross examination, made the

expert painfully aware of those mistakes. Defendants' counsel had Blanchfield re-calculate the amount of damages during the course of cross examination thus arriving at a lower amount for damages which was presented to the jury. Tr. at 263–298.

(6) on wage for 2002 (Tr. at 286); and (7) the failure to consider present value on front pay (Tr. at 295–297).

At the conclusion of the case, the essential economic determinations for the jury to weigh where the expert's disagreed are as follows:

| ISSUE | BLANCHFIELD | SELIG |
|---|---|---|
| *1. Back Pay* | $ 93,811 | $ 60,458 |
| *2. Front Pay* | 58,984 | 0 (essentially) |
| *3. Total Loss Wages* | $ 152,795 | $ 60,458 |
| *4. Working Life Expectancy or Date would have retired.* | At the time of trial, Gatti was age 64 and would have a working life expectancy to age 67 years, thereby extending lost future wages until 2005 (3.7 years longer). (This assumption was set forth in his initial report as well.) | Determine that Gatti's work life expectancy would be age 65 and the future loss period would extend to January 17, 2003. |

It appears from the Jury's Verdict Form (Dkt. No. 59) that the jury accepted most if not all of the Defendants' economic contentions but one—working life expectancy. As they are instructed, the jury can accept all or any portion of any witness's testimony as credible and this rule applies to expert witnesses as well. The jury found that Gatti had a work life expectancy of 2.6 years from the date of the verdict, thus giving Gatti an award for front pay in the amount of $44,308. The back pay award is $57,453. In addition to the Jury's determination of the award for back and front pay, they inadvertently provided insight into their actual calculations for front pay with pencil marked arithmetic on the third page of the Verdict Form, and this Court is able to reasonably extrapolate from the record and the Verdict Form how the jury may have arrived at both back and front pay.[9]

**9.** With regard to the calculation of back pay, the jury commenced with the Defendants' evaluation:

| | | |
|---|---|---|
| Defendants' Back Pay (Tr. at 489) | | $ 60,458 |
| subtracted: | | |
| 1. Defendants' calculation of economic loss from Oct 30, 2002 to January 17, 2003 (Tr. at 486, line 22)($971) | 968 * | |
| 2. Probably reduced the back pay for business expenses Gatti may have overly deducted from her income for 2002 (Tr. at 512) ($2274) | 2037 * | 3,005 |
| | | |
| Total | | $ 57,453 |

With regard to calculation of front pay, it appears that the jury calculations were based upon the Defendants' analysis except they determined that Gatti's work life expectancy would be 2.6 years.

| ASSUMPTIONS | 2003 | 2004 | TOTAL |
|---|---|---|---|
| *1. It appears that the jury accepted the Defendants' calculation of Gatti's baseline earning of $27, 272 (Tr. at 485). The jury also accepted that her salary would increase 3% each year she works. Tr. at 485–6.* | $ 28,090 * | $ 28,933 * | $ 57,023 |
| *2. It appears that the jury subtracted from the baseline earnings the net profit for her self-employment. The Defendant calculated her net profit for the tax year 2003 as $7246.* | $ 7,234 * | $ 7,523 * | $ 14,757 |

In any event, the Defendants were well aware of Dr. Blanchfield's opinion on work life expectancy prior to his testimony. He had included this opinion in his initial report and the Defendants were on notice that he would probably testify accordingly. Such breach in not disclosing this new information is of minimal consequence to the Defendants and the Court has the power to conduct a review of the circumstances and create an appropriate sanction if necessary. Here, precluding Gatti from offering expert testimony concerning economic loss would have significantly impaired her ability to prove her case. Where the noncompliance with discovery rules was limited and insignificant and may have been a single instance of the entire discovery process, as here, there was no cause to adjourn the trial and Community Action and Daly suffered no prejudice from the noncompliance, therefore, preclusion of the testimony of the economic loss expert would sanction too greatly Gatti's noncompliance. *Lory v. General Elec. Co.,* 179 F.R.D. 86, 89 (N.D.N.Y.1998); *see also Outley v. City of New York,* 837 F.2d 587 (2d Cir.1988).

There were sufficient facts for the jury to find that the Plaintiff was entitled to both back and front pay, as determined by them. The jury's conclusion on both back and front pay was neither substantially erroneous or a miscarriage of justice. *See supra* n.6. Therefore, this argument provides not justification for the Court to either set aside the trial or grant a new trial.

### (c) The Award for Emotional Distress

■ In addition to awarding back and front pay, the jury rendered a verdict on emotional pain and suffering in the amount of $80,000. Dkt. No. 57. Although the ADEA permits · a recovery for back and front pay, it does not allow such a recovery for emotional distress. *Johnson v. Al Tech Specialties Steel Corp.,* 731 F.2d 143, 147 (2d Cir.1984); *Courtney v. City of New York,* 20 F.Supp.2d 655, 660 (S.D.N.Y. 1998) (citing *Comm'r of Internal Revenue v. Schleier,* 515 U.S. 323, 325–6, 115 S.Ct. 2159, 132 L.Ed.2d 294 (1995)). On the other hand, NYHRL does permit recovery for pain and suffering and emotional distress. N.Y. EXEC. LAW § 297(9); *see also Binder v. LILCO,* 57 F.3d 193, 198 (2d Cir.1995). Defendants claim that the jury verdict on emotional distress is excessive and requires a new trial limited as to this aspect of the damage award or, under the practice of remittitur, citing *Phelan v. Local 305,* 973 F.2d 1050 (2d Cir.1992). Dkt. No. 70, pp. 11–12.

■ In the first instance, a district court that finds a verdict excessive does not have the requisite authority to simply reduce the damage award. *Shea v. Icelandair,* 925 F.Supp. 1014, 1020 (S.D.N.Y. 1996) (citing *Tingley Systems, Inc. v. Norse Systems, Inc.,* 49 F.3d 93, 96 (2d Cir.1995)). The court can make an election between ordering a new trial on the issue, or, in the alternative, may grant remittitur by conditioning denial of the motion for a new trial on the plaintiff accepting damages in a reduced amount. In essence, stated another way, remittitur compels the plaintiff to choose between reduction of an excessive verdict and a new trial. *Phelan v. Local 305,* 973 F.2d at 1064.

| | |
|---|---|
| *3. An estimate for the two more months to compute the 2.6 years of work life expectancy* | $ 2,042 |
| *4. Total Front Pay* | $ 44,308 |

\* Pencil markings on the Jury Verdict Form. Dkt. No. 57.

■ This jury award for emotional distress is derived under the NYHRL cause of action. In determining if a jury award is excessive pursuant to this state statutory provision, the Court must do so pursuant to standards set by state law. In this case, the standard of review for excessive or inadequate jury awards is whether it **deviates materially** from what would be reasonable compensation. N.Y.C.P.L.R. § 5501(c) (emphasis added). It is further incumbent upon the court to review similar cases in determining whether a jury award is excessive. *Meacham v. Knolls Atomic Power Lab*, 185 F.Supp.2d 193, 220 (N.D.N.Y.2002); *Shannon v. Fireman's Fund Ins. Co.*, 156 F.Supp.2d 279, 296–98 (S.D.N.Y.2001). Such a review will provide a meaningful range or guide in such a determination since emotional distress is not easily quantifiable and can be nebulous and nearly speculative.

■ Where emotional distress compasses humiliation, shame, shock, moodiness and being upset, *inter alia,* and yet is devoid of any medical treatment or physical manifestation, it is considered to be "garden variety." The range for this type of emotional distress appears to be as low as $5000 to a relative high of $125,000. *Meacham v. Knolls,* 185 F.Supp.2d at 220–21 ( providing a survey of cases determining emotional distress damages in age and gender discrimination cases). However, where there has been medical treatment or the defendant's conduct exacerbated a pre-existing condition, courts have not restricted the scope of damages to those of "garden variety" and in some instances have been reluctant to disturb the jury award. *Epstein v. Kalvin–Miller,* 139 F.Supp.2d 469 (S.D.N.Y.2001) (court would not disturb a jury award of $54,000 since there were similar verdicts to rely upon and medical treatment was present in the case); *Shea v. Icelandair,* 925 F.Supp. at

1022–25 (the stress exacerbated a pre-existing condition of Parkings's Disease and a heart ailment).

■ Evidence was presented that Gatti suffered emotional distress and certain physical maladies due to Daily's conduct. Tr. at 147–203 (Adrienne Gatti) & 210–213 (John Gatti). Gatti testified that she went to Dr. Samuel Merchant in 1997 because of the stress generated by her insecurities pertaining to her job that caused heart palpitation, which seemed "like a heart attack," and high blood pressure. Tr. at 147–49 & 195. Her husband, John Gatti, testified that his wife's behavior and demeanor changed dramatically over the past five years. Tr. at 210–213. She was subject to weeping and upset constantly due to Daily's behavior towards her. *Id.* In January 1998, she was rushed to the hospital because of abnormally high blood pressure. It was initially thought that she may have experienced a heart attack. Tr. at 149–151. Her identifiable stress, however, may have been caused by two independent stressor—Daly and her concerns over her husband's health. Tr. at 193. John Gatti suffered from cancer (Tr. at 148) and had a back surgery (Tr. at 192, 195 & 237).

Gatti began treatment with Dr. Methane's practice group on or about February 19, 1996, listing a history of heart palpitations, high blood pressure and gall stones. Tr. at 228–34. Further, Gatti had a problem controlling her weight. Tr. at 196. In 1997, Gatti saw Methane for the first time specifically about the stress, anxiety, hypertension and palpitations she was experiencing. Tr. at 217–20. Megohm's records indicate that he knew of her difficulties at work but it seemed that her complaints of anxiety-related symptoms in November 1997 were more directly related to her husband's medical condition, and her complaints in 1998 were directly aligned with

problems at work and her termination. Tr. at 235–37. She was hospitalized in January 1999 for a host of medical complications. Her symptoms then included gall stones, obesity, anxiety disorder, chest pain, and cardiac problems. Tr. at 224–25. All of these factors contributed to her high level of anxiety. Tr. at 226. To a certain degree, and in certain patients, an attack of gall stones can cause upper chest cavity pain, something Gatti was experiencing. Tr. at 232–34 & 241–42. In order to control her hypertension, with her weight being a moderate contributing factor, Gatti was prescribed medication and placed on an exercise (walking) regimen. Tr. at 196 & 230.

Defendants assert that Gatti suffered a "garden variety" emotional distress and that all of her stress and physical ailments, such as hypertension, chest pains, and gall stones, pre-existed anything that Daly could have possibly created. Because her medical treatment cannot be "definitively traced" to Daly, Defendants suggest that this Court treat her claims of emotional distress as nothing more than basic and common and therefore reduce the jury award of $80,000 to $20,000. The issue then for the Court is to determine if these circumstances are "garden variety." To reiterate, emotional disturbance without medical treatment fall within the "garden variety" rubric. *Meacham v. Knolls Atomic*, 185 F.Supp.2d at 220, n. 24. However, in this case, there was treatment of stress related conditions since 1997 and two hospitalizations occurring in 1998 and 1999, which may take damages beyond the realm of "garden variety" and entitle the Plaintiff to greater damages. *Shannon v. Fireman's Fund*, 156 F.Supp.2d at 298. Even if we accept that Gatti's hypertension and heart condition were pre-existing, these factors alone would not relegate her complaints to the lower rung of damages. Daily's actions and the corresponding

stress could have aggravated a pre-existing condition giving rise to greater damages. *Shea v. Icelandair*, 925 F.Supp. at 1024 (citing *Maurer v. United States*, 668 F.2d 98, 99–100 (2d Cir.1981)). Medical treatment and pre-existing condition notwithstanding, there is the more problematic issue of attempting to disentangle the stress created by both her job and her husband, if that is at all possible.

Even if we set aside the debate over pre-existing conditions and medical treatment, the Court may still need to determine what is the reasonableness of this $80,000 award if it is to be classified as a "garden variety" emotional distress case. In order to do so, the Court must turn to similar cases. *Meacham v. Knolls Atomic*, 185 F.Supp.2d at 220. As to "garden variety" cases, in 2002, United States Magistrate Judge David R. Homer, who sits in the Northern District of New York where this case's jurisdiction lies, first conducted a survey of similar cases within the Second Circuit and then concluded that the current range appears to be $5000 to 125,000. *Id.* He then applied this analysis to sixteen (16) individual plaintiffs who had claims for emotional distress. The *Meacham* jury returned awards as low as $40,000 to a near high of $400,000. Only two of the plaintiffs sought medical treatment and their emotional distress awards were not reduced by Judge Homer. In six of the cases, where the jury award was less than the maximum of $125,000, Judge Homer let the award stand. The median award for these plaintiffs was approximately $95,000. Where the jury award exceeded the $125,000 maximum amount, Judge Homer granted the defendant's request for a new trial unless the specific plaintiff accepted the remittitur of $125,000. In reference to these reduced awards, two of them were reduced to $175,000. The reason for these two plaintiffs receiving more

than $125,000, even though they did not receive medical treatment, was due to either an aggravation of a pre-existing injury or their condition had a significant physical manifestation that required medical treatment. In support of this ruling, Judge Homer cited to *Shea v. Icelandair,* 925 F.Supp. at 1019–30 ("The most important factor that sets this case apart from others involving emotional pain and suffering is the fact that [defendant's] discriminatory conduct had physical consequences").

Comparing Gatti with these plaintiffs, especially those whose awards were not the subject of a remittitur, strongly suggests that Gatti's jury did not deviate materially from the compensation currently found reasonable in other cases in the Northern District of New York. Even with stress being caused by different circumstances, Gatti's jury, considering the totality of the evidence, could and did conclude that $80,000 was a reasonable sum for her pain and suffering caused by the Defendants. There was medical treatment during this period of high anxiety though other factors may have concomitantly contributed to her physical discomfort. The jury could have reasonably found that the physical consequences were proximately caused by the Defendants' conduct. Therefore, on the evidence, the jury's award to Gatti for emotional distress did not deviate materially from the maximum compensation found reasonable in other similar cases. The Defendants' motion to set aside the verdict or a new trial on this issue is denied.

### 3. Attorney Fees and Costs

#### (a) Background

Gatti's attorneys seek attorneys' fees and expenses in the amount of $122,854.53 as the prevailing party in this litigation. Dkt. Nos. 73–75. As expected, the Defendants vigorously oppose the amount of the award on various grounds, each of which will be addressed separately below. Dkt. No. 87. In order to appreciate the Court's analysis on the award of counsel fees, it is necessary for a history of Gatti's legal representation.

Ms. Gatti and others retained Patricia Schneider, Ess. ("Schneider") regarding their dispute with the Defendants in April 1997. At that juncture, these parties were involved in significant disagreements regarding the infrastructure, management, and employment. Schneider represented Ms. Gatti and others on all these disagreements. Thereafter, she commenced a state court proceeding on behalf of these clients. That proceeding, we believe, is currently pending. Ms. Schneider also obtained permission to sue letters from the Equal Employment Opportunity Commission ("EEOC") on behalf of all of her clients including, of course, Gatti. After working for more than two years on the aforesaid disagreements, and commencing the state action, on September 30, 1998, Ms. Schneider consulted Kernan and Kernan, PC. for aid in litigating the claims in federal court. Dkt. No. 75 (Schneider Time Sheets). On October 13, 1998, a Complaint was filed in this Court by Ms. Schneider. Dkt. No. 1. On December 7, 1998, Kevin Martin, Ess. of Kernan and Kernan, PC., submitted a notice of attorney appearance for Adrienne Gatti. Dkt. No. 2. From that point, Kernan and Kernan, PC. was the attorney of record for Ms. Gatti. Notice of appearance notwithstanding, Ms. Schneider contends she contacted the Kernan Firm to aid as cocoons and that she remained general counsel throughout the litigation. At trial, Ms. Schneider appeared with James Hyde, Ess. and Mr. James Goodman, Ess. Ms. Schneider, however, played no active role in the trial itself. Initially, in the pre-trial

stage, it appears that Kevin Martin of the Kernan Firm was directing the prosecution of this federal litigation. As the case moved toward trial, James Hyde, Ess. assumed the helm of presenting the Plaintiff's case.

Both Ms. Schneider and Kernan and Kernan, PC. have submitted time sheets for the Court's perusal in awarding appropriate attorneys' fees and costs.

### (b) Calculating the Lodestar Figure

In determining whether a civil rights plaintiff is entitled to attorneys' fees, courts must determine (1) whether the plaintiff is the prevailing party and (2) whether the fees requested are reasonable. *See Pino v. Locascio*, 101 F.3d 235, 237 (2d Cir.1996) (citing *Farrar v. Hobby*, 506 U.S. 103, 109, 113 S.Ct. 566, 121 L.Ed.2d 494 (1992)).

Plaintiffs are considered prevailing parties if they receive actual relief on the merits of their claim. *See Gierlinger v. Gleason*, 160 F.3d 858, 880 (2d Cir.1998) (citing *Farrar*, 506 U.S. at 111, 113 S.Ct. 566). The Defendants do not contest that the Plaintiff is the "prevailing party" in this litigation and therefore entitled to reasonable fees. They do challenge, however, the reasonableness of the requested fees.

In order to determine what fee is reasonable courts must calculate the "lodestar figure," which is arrived at by multiplying the number of hours reasonably expended on the litigation by a reasonable hourly rate. *Hensley v. Eckerhart*, 461 U.S. 424, 433, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983). This appears to be the only acceptable method to calculate the award of attorney fees within the Second Circuit. *Quaratino v. Tiffany & Co.*, 166 F.3d 422, 424–25 (2d Cir.1998) (declining to adopt a "billing judgment" approach in awarding attorney fees asserting there exists a "strong presumption" that the Lode-

star figure represents a reasonable fee). The number of hours expended for use in the lodestar calculation includes "the number of hours claimed by plaintiff's attorneys that are supported by time records, that are not excessive or duplicative, and that do not reflect work done *only* in connection with *unrelated* claims upon which plaintiffs did not succeed." *LeBlanc-Sternberg v. Fletcher*, 143 F.3d 748, 764 (2d Cir.1998) (emphasis added).

### (c) Calculating the Reasonable Hourly Rate

The hourly rate to be used "should be in line with those [rates] prevailing in the community for similar services of lawyers of reasonably comparable skill, experience, and reputation." *Cruz v. Local Union No. 3 of the Int'l Bd. of Elec. Workers*, 34 F.3d 1148, 1159 (2d Cir.1994) (citing *Blum v. Stenson*, 465 U.S. 886, 896, n. 11, 104 S.Ct. 1541, 79 L.Ed.2d 891 (1984)). The relevant community to which the court should look is the district in which the case was brought. *In re Agent Orange Prod. Liab. Litig.*, 818 F.2d 226, 232 (2d Cir.1987). Furthermore, the rates used by the Court should be "current rather than historic hourly rates." *Gierlinger*, 160 F.3d at 882 (citing *Missouri v. Jenkins*, 491 U.S. 274, 284, 109 S.Ct. 2463, 105 L.Ed.2d 229 (1989)).

The current prevailing hourly rates generally applied in this district are: $175.00 for civil rights attorneys with significant experience and numerous years of practice; $125.00 for associates with four or more years of experience; $100.00 for newly admitted attorneys; and $65.00 for paralegals. *People ex rel. Vacco v. Rac Holding, Inc.*, 135 F.Supp.2d 359, 363 (N.D.N.Y.2001) (Kahn, J.); *Sheet Metal Div. of Capitol Dist. Sheet Metal, Roofing & Air Conditioning Contractors Ass'n, Inc. v. Local Union 38 of Sheet Metal*

*Workers Intern. Ass'n,* 63 F.Supp.2d 211, 214–15 (N.D.N.Y.1999) (Many, C.J.); *TM Park Ave. Assocs. v. Pataki,* 44 F.Supp.2d 158, 167 (N.D.N.Y.1999) (Many, C.J.).

Both Kernan and Kernan, PC. and Patricia Schneider, Ess. have submitted billing statements for the Court's consideration in awarding reasonable attorney fees. Ms. Shedder's billing statements span the entire course of the representation and litigation, including time expended even after her retention of Kernan and Kernan. Ms. Schneider is seeking $40, 215.00 for legal services provided from April 1, 1997 (the date of the initial client consultation) through November 1, 2002 (the date the jury returned their verdict), totaling 268.10 hours at a rate of $150 per hour. Kernan and Kernan, PC. is seeking $74,206.25 for legal services provided totaling almost 500 hours for five attorneys, four of whom billed at $175 per hour (James W. Hyde, Kevin Martin, Michael Stephen, and Gregory Haemin) while James Goodman is seeking a rate of $150 per hour. This figure is based on legal services provided from September 30, 1998 (the date of the initial telephone conference with Ms. Schneider regarding the Plaintiff's case) through December 20, 2002 (the last date in which work had been completed on the case which includes work done in conjunction with the Defendants' opposition post-trial motions totaling $3,292.50 ($2395.00 for 13.80 hours of work done in conjunction with Defendants' Motion to Set Aside the Verdict and for a New Trial, Dkt. No. 80, plus $897.50 for 4.30 hours for work done in conjunction with Defendants' Opposition to Plaintiff's Motion for Attorneys' Fees, Dkt. No. 83). Additionally, Kernan and Kernan seek an award of $8,433.28 for costs incurred throughout the litigation. Therefore, Plaintiff seeks attorneys' fees and costs totaling $122,854.53 ($40,215.00 + $74,206.25 + $8,433.28 = 122,854.53).

### (1) Patricia Schneider, Ess. and Hourly Rate

 Ms. Shedder's affidavit indicates that she graduated from Thomas M. Cooey Law School in Michigan in 1994. Dkt. No. 75, Schneider Aff. at 1. She was admitted to the New York State Bar in 1996 and in 1998 was admitted to practice in the United States District Court Northern District of New York. *Id.* at 2. Since that time she has been involved in seven United States District Court cases, including this action. *Id.* at 3. Ms. Schneider conceded the difficulty she experienced in handling the perceived complexity of the litigation and thereafter sought the aid of an experienced law firm. Specifically, she asserts that the complex issues combined with the labor intensive demands of this particular litigation proved to be too much given her limited experience in this field. She contends that she contacted and ultimately retained the Law Firm to assist her as "co-counsel" while she remained general counsel. At the outset, the Court is cognizant of the fact that she first raises the issue of her role as general counsel in her reply brief to the Defendants' opposition papers to her motion for attorney fees. The Court does not accept her contention that she remained general counsel. In fact, she, in effect, waived her right to claim such status when she retained the Law Firm and permitted the docket to reflect them as the attorney of record. As such, the Court finds that given Ms. Shedder's overall experience and participation in this case a reasonable rate of $125 per hour should be imposed in line with those rates normally charged for associates with four or more years experience.

### (2) James W. Hyde, Ess. and Hourly Rate

James W. Hyde, Ess. is admitted to practice in the State of New York, United

States District Court for the Northern District of New York, United States District Court for the Eastern District of Virginia, and the United States Courts of Appeals for the Second and Fourth Circuits. Dkt. No. 73, Hyde Aff. at 1. He graduated from George Mason University School of Law in 1993 and has worked at numerous law firms within the District of Columbia, Virginia, and New York. His practice of law constitutes general civil and criminal trial and appellate practice. *Id.* at 6. He has been practicing in New York since 1999 and joined the Kernan and Kernan Law Firm in 2000. *Id.* At Kernan and Kernan, Mr. Hyde has continued a general litigation practice but the majority of his caseload has been in the area of employment discrimination including numerous administrative hearings and proceedings, trials, and appellate representation. *Id.* Mr. Hyde played an integral role as lead trial counsel and as such, the Court finds that given Mr. Hype's overall experience in conjunction with his centralized role as lead counsel, a reasonable rate of $175 per hour should be imposed.

### (3) James Goodman, Ess. and Hourly Rate

Mr. Goodman, an associate at Kernan and Kernan, PC., graduated from Brooklyn Law School, *cum lade*, in 1988. Dkt. No. 73, Goodman Aff. at 1–2. Mr. Goodman is admitted to practice law in New York State, United States District Court for the Western District of New York, United States District Court for the Northern District of New York, and the United States Court of Appeals for the Second Circuit. *Id.* at 4. Goodman joined Kernan and Kernan in 2002 and works primarily on litigation matters including the prosecution and defense of personal injury claims, civil rights claims, commercial disputes, corporate governance issues, real estate disputes, municipal liability and

insurance benefits claims and coverage. *Id.* at 7. Prior to that, he worked for an insurance defense firm where his responsibilities centered primarily on pre-trial practice for an array of cases including personal injury, property damage, civil rights, municipal liability, products liability, insurance coverage, as well as "environmental clean-up" lawsuits. *Id.* at 6. In light of Mr. Goodman's experience as well as his contribution to the Gatti trial, the Court finds the proposed rate of $150 to be reasonable.

### (4) Kevin Martin, Ess. and Hourly Rate

Mr. Martin, a partner of Kernan and Kernan, PC., graduated from Syracuse University College of Law, *magna cum lade*, in 1988. Dkt. No. 73, Martin Aff. at 2–3. Prior to joining Kernan and Kernan in 1997, Mr. Martin practiced in two different law firms specializing in employment litigation, "particularly in federal court on both management and plaintiff's side." *Id.* at 2. He has also given numerous presentations to state and local bar groups as well as private organizations on employment law topics. *Id.* at 3. He is the author of the "1994–95 Survey of New York Labor Law" and "1995–96 Survey of New York Labor Law" published in Volumes 46:2 and 47:2 of the Syracuse Law Review. *Id.* When Ms. Schneider originally contacted Kernan and Kernan, in light of the difficulty she experienced in handling the highly specialized area of the law, it was Mr. Martin who carried out the initial work done on the case. Given Mr. Martin's concentrated experience in this area of the law and his overall contribution to the case at hand, the Court finds the proposed rate of $175 per hour to be reasonable.

### (5) Michael Stephen, Ess. and Gregory Haemin, Ess. and Hourly Rate

According to Mr. Hype's Affidavit, Mr. Stephen and Mr. Haemin are both share-

holders in Kernan and Kernan, PC. and provided minimal assistance in the case within. Dkt. No. 73, Hype's Aff. at 5. Although neither individual provided affidavits, Mr. Hyde affirmed that Mr. Stephen and Mr. Haemin each possess in excess of twenty-five years experience in the general practice of law in New York State. *Id.* As such, given their overall experience, a rate of $175 per hour is reasonable.

#### (d) Other Adjustments

■ Once the lodestar figure has been calculated, the district court has discretion to make further adjustments as to the reasonableness of requested reimbursement. The Second Circuit has held that an application for attorneys' fees must be supported by detailed, contemporaneous time records indicating the attorney who performed the work, "the date, the hours expended, and the nature of the work done." *New York Ass'n for Retarded Children v. Carey,* 711 F.2d 1136, 1148 (2d Cir.1983) (cited in *People ex rel. Vacco v. Rac Holding, Inc.,* 135 F.Supp.2d 359, 363 (N.D.N.Y.2001).

■ There are many relevant facts a court should consider in adjusting submitted fees including: (1) time and labor required; (2) novelty and difficulty of the questions; (3) skill requisite to perform the legal service properly; (4) preclusion of employment by the attorney due to acceptance of the case; (5) customary fee; (6) whether the fee is fixed or contingent; (7) time limitations imposed by the client or the circumstances; (8) amount involved and the results obtained; (9) experience, reputation, and ability of the attorneys; (10) the "undesirability" of the case; (11) the nature and length of the professional relationship with the client; and (12) awards in similar cases. *Hensley v. Eckerhart,* 461 U.S. 424, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983) (citing *Johnson v. Georgia Highway Express, Inc.,* 488 F.2d 714, 717–19 (5th Cir.1974) (deriving factors from the AM. BAR ASS. CODE OF PROF. REP., DISC. R. 2–106; *see also Sheet Metal Div. of Capitol Dist. Sheet Metal, Roofing & Air Conditioning Contractors Ass'n, Inc.,* 63 F.Supp.2d at 214.

■ The district court is embodied with broad discretion to independently review and assess the reasonableness of the claimed rates as well as hours worked. *Jones v. Amalgamated Warbasse Houses, Inc.,* 721 F.2d 881, 884 (2d Cir.1983); *see also LeBlanc–Sternberg,* 143 F.3d at 764 ("[I]f the court excludes claimed hours from the calculation of the lodestar figure it must state its reasons for doing so as specifically as possible.").

■ It is well recognized that when more lawyers than are necessary are assigned to a case, the level of duplication of effort increases and case law disallows fee requests for hours that are "excessive, redundant, or otherwise unnecessary." *Hensley v. Eckerhart,* 461 U.S. at 434, 103 S.Ct. 1933; *Luciano v. Olsten Corp.,* 109 F.3d 111, 116–17 (2d Cir.1997). "Authority supports reduction in the lodestar figure for overstating as well as for other forms of duplicative or inefficient work." *Seigal v. Merrick,* 619 F.2d 160, 165, n. 9 (2d Cir.1980).

Rather than sift through the submitted time sheets, the Court can "exclude excessive and unreasonable hours from its fee computation by making an across-the-board reduction in the amount of hours." *Luciano v. Olsten Corp.,* 109 F.3d 111, 117 (2d Cir.1997) (citing *In re "Agent Orange" Prod. Liab. Litig.,* 818 F.2d 226, 237–38 (2d Cir.1987)). The courts within the Second Circuit have exercised this authority and have reduced fees accordingly. *See TM Park Ave.,* 44 F.Supp.2d at 169 (10%

reduction to correct for insufficient detail in the submitted billing entries); *Mr. X v. New York State Dep't of Educ.,* 20 F.Supp.2d 561, 564 (S.D.N.Y.1998) (20% reduction to account for vague, incomplete, and duplicative time entries); *General Electric Co. v. Compagnie Euralair, S.A.,* 1997 WL 397627, at *4–6 (S.D.N.Y. Jul.3, 1997) (reducing the fee request by 50% for, *inter alia,* excessive and duplicative hours billed); *N.S.N. Int'l v. Du Pont,* 1996 WL 154182, at *4 (S.D.N.Y. Apr.3, 1996) (15% reduction for attorney conferences and vagueness of billing entries); *United States v. Gehl,* 1996 WL 31315, at *3 (N.D.N.Y. Jan.23, 1996) (court reduced attorney's fees because "the work performed appears to be duplicative, and the time spent on a considerable portion of the services rendered excessive."); *Walker v. Coughlin,* 909 F.Supp. 872, 881 (W.D.N.Y. 1995) (15% reduction to reflect inadequate documentation and lower rate of compensation); *Carrero v. New York City Housing Auth.,* 685 F.Supp. 904, 908 (S.D.N.Y. 1988) (stating reductions will be made "where the attorneys essentially duplicated each other's efforts"), *aff'd,* 890 F.2d 569 (2d Cir.1989).

Defendants pose numerous challenges as to the *reasonableness* of the *total fees* sought by Plaintiff in that they are excessive and duplicative. Each of the contentions will be addressed separately, however, rather than reducing the amount of redundant, duplicative, excessive, or otherwise unnecessary billed hours, or parceling out which of the fees are warranted, the Court will, as it is within its discretion, make an across the board percentage cut in Plaintiff's fee award as deemed appropriate. *See Marisol A. ex rel. Forbes v. Giuliani,* 111 F.Supp.2d 381, 390 (S.D.N.Y. 2000) (citing *In re Agent Orange,* 818 F.2d 226, 237–38 (2d Cir.1987) (stating that "in cases in which substantial numbers of volu-minous fee petitions are filed, the district court has the authority to make across-the-board percentage cuts in hours 'as a practical means of trimming fat from a fee application.'") (quoting *New York State Ass'n for Retarded Children, Inc. v. Carey,* 711 F.2d 1136, 1146 (2d Cir.1983)); *see also United State Football League v. Nat'l Football League,* 887 F.2d 408, 415 (2d Cir.1989) (approving a percentage reduction of total fee award to account for vagueness in documentation of certain time entries).

### (1) Objections to Fees Sought by Kernan and Kernan, PC.

The Defendants first challenge the reasonableness of fees charged by Kernan and Kernan, PC. by arguing that: (1) the fees are duplicative in several respects; (2) the fees are excessive and redundant and otherwise unnecessary; and (3) the case was not so complicated as to warrant the excessive conferences or the presence and billing of two attorneys at trial. Dkt. No. 82, Mem. of Law of Defls. Opposing Pl's Mot. for Atty Fees.

As to the first objection, Defendants note that in comparing the bills submitted from both law firms from September 1998 (the date Kernan and Kernan became involved), Ms. Shedder's work consisted primarily of status reports and reviewing correspondence or documents prepared by Kernan and Kernan. *Id.* at 2. Defendants assert that since Kernan and Kernan had already submitted a bill for the preparation of such documents, the billing for Ms. Shedder's review is duplicative. *Id.*

At the outset, it is patently clear that some overlap does exist at the juncture when Kernan and Kernan was retained. The Court, however, finds that initial consultations and review would be necessary in these types of cases to bring the new law firm up to speed. Defendants assert

that they should not have to pay for the Plaintiff's decision to switch law firms. The Court finds that, given the nature of the litigation, it was proper for Ms. Schneider to seek the assistance of more experienced attorneys. Furthermore, as Ms. Schneider was intimately associated with the issues in the case, and had spent an abundance of time on such, her input at the outset would be and proved to be invaluable to the new firm. The Court does not find such billing at the outset to be duplicative as each attorney played a vital role in ensuring their client's case was handled properly. Accordingly, Ms. Shedder's initial time spent reviewing and concerning is not duplicative nor excessive but rather necessary to ensure that all attorneys are well informed of the facts surrounding the case, thus ensuring competent representation.

After the initial consultations, however, the Court tends to agree with the Defendants' arguments of excessiveness. Regardless of whether Ms. Schneider remained general counsel, lead counsel, or co-counsel, the fact remains, and she has admitted as much, that the Kernan law firm was retained in an acknowledgment of their experience in handling complex employment litigation and her lack thereof. Indeed, Ms. Schneider affirms that she sought their help due to her perception of the complexity of the issues and amount of labor required. Therefore, her continued review of documents drafted by Kernan is wholly unnecessary especially in light of the fact that five experienced attorneys were assigned to work on the case at various stages. Defendants propose that the time for status conferences and phone calls between Ms. Schneider and Kernan and Kernan be excluded from both applications. The Court is not prepared to go that far, but such considerations will be taken under advisement in the overall percentage cut. The Court is cognizant Ms.

Schneider may have provided assistance to the ongoing litigation in other respects. Whatever her role may have been, be it client-counselor or coach, Defendants' arguments that her need to be kept up to date as well as to review drafted documentation is excessive and duplicative or otherwise unnecessary has merit.

Next, Defendants likewise object to excessive, redundant, or otherwise unnecessary fees charged by Kernan and Kernan. Specifically, Defendants assert that they should not bear the costs of the attorneys at Kernan and Kernan conferring with each other nor should they pay for Plaintiff's decision to switch firms thus requiring various attorneys to "get up to speed" on the case. *Id.* at 3. After reviewing the submitted time sheets, the Court does find that given the nature of the case, some of the conferences and status calls were necessary, and others excessive. There were times when Ms. Schneider and the Kernan law firm would confer almost daily regarding status reports. The relative nature of this case does not justify the overuse of such concerning and, therefore, the Court will consider this in the overall percentage adjustment.

Finally, the Defendants object to Plaintiff billing for two attorneys from the Kernan Law Firm at trial. They base this contention on the fact that they themselves had two attorneys present but only billed for one attorney. *Id.* at 3–4. Whether and in what manner the Defendants charge their client is of little relevance to the Court in assessing attorney fees. Indeed, what is critical for this analysis is that the Defendants felt the need for two attorneys to properly represent themselves at trial. Furthermore, it is clear that Mr. Hyde and Mr. Goodman had distinct roles in their participation at trial. While Mr. Hype's role was clearly lead trial counsel, Mr. Goodman was responsi-

ble for conducting the direct examination of their economist. His presence at the trial would therefore be necessary in order to conduct his examination competently, among other supporting roles. Ms. Shedder's presence at the trial and the subsequent billing, however, is another matter. It is clear to the Court that whatever role she may have had in the pre-trial preparation, i.e., preparing a witness to testify, her role at the trial seemed to be no more than that of a security blanket for the client who originally retained her. Therefore, the Court will consider this in making its overall percentage adjustment.

### (2) Objections to Fees Sought by Patricia Schneider, Ess.

The Defendants make further objections to the reasonableness of the fees sought by Ms. Schneider mainly stemming from: (1) the vagueness of billing statements to allow for clarification as to the portion of work done in conjunction with the state court action; (2) the work done as to organization politics, funding, suspension and dismissal, and internal hearings was not clearly parceled out from work done on the federal case; and (3) the amount of time employed even after retention of Kernan and Kernan, PC. was unnecessary causing multiple instances of duplication. *Id.* at 4–6.

Ms. Shedder's involvement with the case began in April 1997, when she was retained by Plaintiff along with other similarly situated individuals. From April 1997 through October 1998, Ms. Schneider was "sole counsel" for the Plaintiff. During this time, she represented Plaintiff in relation to her conflicts with her employer and state court complaint "and all motions and proceedings surrounding same in addition to the background, investigation and commencement for the within Federal action." Dkt. No. 75, Schneider Aff. at 4.

Finding the particular claims within to be labor intensive and complicated, Ms. Schneider, upon referral, contacted the law offices of Kernan and Kernan, PC. to "obtain assistance as co-counsel due to the *complicated issues involved in this matter and their experience with handling State and Federal Discrimination claims." Id.* at 6 (emphasis added). Schneider has submitted time sheets reflecting work done in relation to this matter from April 1, 1997 (initial client counseling) through November 1, 2002 (jury verdict).

The Court has perused Ms. Shedder's time sheets and determined it to be inordinately vague. Indeed much of the time sheets submitted leaves the Court to surmise what transpired. It is the responsibility of the attorney to submit lucid billing statements allowing for Court verification of reasonableness. It is unclear to the Court what portion of Ms. Shedder's time was allocated to the state claim or other claims, i.e. organizational politics. Furthermore, Ms. Schneider has not adequately justified to the Court why her continued participation was necessary after retaining Kernan and Kernan. Since she retained them in light of their experience for handling such matters, it is unclear to the Court why it was necessary that she review their drafted documents or even confer on an almost daily/weekly basis. The Court is keenly aware of the vital role Ms. Schneider played at the outset of this litigation as well as the amount of time and labor spent. Such involvement will not be overlooked and her participation in ultimately procuring a favorable verdict will be reimbursed, however, in light of the duplication and excessiveness of counsel, the Court will make an across-the-board percentage deduction in the overall fees.

### (e) Court Determination of Award

Plaintiff's attorneys have submitted a billing statement for costs amounting to $8433.28. Defendants do not oppose the

award of costs. Therefore, after reviewing the submitted billing statement, the Court awards the Plaintiff costs in the aforesaid amount.

■ In determining the reasonableness of the proposed fee application, we commence with Patricia Schneider. As previously discussed, we conclude that her lodestar rate is $125.00 per hour. *See infra*, Pt. I.e. Our review of her application indicates an hourly breakdown into two classifications as follows:

| Classification | Date | Total Hours | Amount Based Upon the Rate of $125.00 |
|---|---|---|---|
| *Pre–Federal Litigation* | April 1, 1997 to September 30, 1998 | 145.60 | $18,200 |
| *Federal Litigation* | September 30, 1998 to November 1, 2002 | 123.40 | 15,425 |
| *Total* | | 269.00 | $33,625 |

With regard to the pre-federal litigation, we know that Schneider advised her clients during this period on a myriad of issues inextricably related to the debacle taking place at Community Action. Some of that advice dealt with legal issues pertinent to the internal politics and in other respects her advice had to do with labor and employment issues. It is certain that her involvement with both the Plaintiff and the Defendant Community Action at that juncture provided her with significant intelligence to constitute an investigation which would ultimately support litigation such as a federal lawsuit. Surely, the gathering of information was used to support Plaintiff's state lawsuit. But Counselor should not and will not be permitted to extrapolate upon unrelated matters to bolster the amount of her application. She cannot bootstrap in order to receive a fee upon those tasks which were performed outside the context of pursuing a federal lawsuit.

Close scrutiny of her application does not assist this Court in any matter to separate her roles during this time period from what may constitute related and helpful investigation for the federal action and what is deemed unrelated and merely other representation. Her summaries are vague and provide no clue on how to delineate between relevant and unrelated, and yet the Court feels compelled to give her credit for the work she performed during this time because without a doubt those efforts contributed toward the commencement of this lawsuit and give insight into the issues at the Head Start Program. The Court, rather than dismissing the request for this time period, will give Schneider credit for fifty percent (50%) of her efforts. Therefore, for the pre-litigation stage, Schneider will receive $9,100.

We have already mentioned our assessment that Shedder's role in this litigation after the Kernan law firm was designated the attorney of record and acted as lead attorney, notwithstanding Shedder's claim that she was "General Counsel," was duplicative and unnecessary. Yet, the Court appreciates how these cases are litigated and realizes that even during this period, Schneider made relevant contribution to the prosecution of this matter. Although her records are unclear on this point, the Court does presume that she had significant client contact, procured evidence, obtained relevant discovery and authorizations from her client, and indeed performed other vital roles, since her office was in closer proximity to the Plain-

tiff and Defendants, and invariably the evidence. Moreover, this Court does not view this litigation as complex to the extent that five attorneys, even three, are required. Shedder's role at times was minimal, if not nominal. Therefore, her fee during the period of the litigation will be reduced thirty-five percent (35%) which amounts to a final sum of $10,026. The grand total for Schneider is $19,126.

As to the Kernan law firm application, these attorneys seek a sum of $74,206.25 for counsel fees and this Court has already accepted the lodestar rates for each of them. This Court has previously highlighted that their application is not without duplication and excessive, though we do not agree with the Defendants' assessment of the abuse. We do not view the duplication as dramatically as the Defendants. The conferences with Schneider and, in some respects, the conferences among themselves, were unwarranted. In most respects, however, conferring is vital to prepare a successful prosecution or defense of a matter such as this.

Once again, the Court is unable to determine, from what has been provided, the viability of some conferences over others, especially those with Schneider. Because of the vagueness in the records, the Court is compelled to exercise its discretion to reduce the Kernan counsel fees by ten percent (10%). In that case, the final amount of counsel fees for the Kernan law firm is $66,785.63. Adding Schneider and the Kernan adjusted attorney fees ($85,-911.63) and the permitted cost ($8433) together, the Plaintiff's attorneys are awarded the sum of $94,344.63.

### 4. Interest

■ Plaintiff seeks, and Defendants do not contest, an award of pre-judgment interest on her back pay award, pursuant to 29 U.S.C. § 626(b), in the amount of $8,873.45.[10] "In an ADEA case, pre-judgment interest is designed to compensate the plaintiff for loss of the use of money wrongfully withheld through an unlawful discharge." *Reichman v. Bonsignore, Brignati & Mazzotta, P.C.,* 818 F.2d 278, 281 (2d Cir.1987). The decision to award pre-judgment interest is "[o]drearily left to the discretion of the district court." *Gierlinger v. Gleason,* 160 F.3d 858, 873 (2d Cir.1998). The Second Circuit has held that, "[t]o the extent ... that the damages awarded to the plaintiff represent compensation for lost [back] wages, 'it is ordinarily an abuse of discretion not to include pre-judgment interest.'" *Gierlinger v. Gleason,* 160 F.3d 858, 873–74 (2d Cir. 1998) (quoting *Saulpaugh v. Monroe Community Hospital,* 4 F.3d 134, 145 (2d Cir. 1993)).

The Supreme Court has determined that "[d]inclusionary awards of prejudgment interest ... should be a function of (i) the need to fully compensate the wronged party for actual damages suffered, (ii) considerations of fairness and the relative equities of the award, (iii) the remedial purpose of the statute involved, and/or (iv) such other general principles as are deemed relevant by the court." *Wickham Contracting Co. v. Local Union No. 3,* 955 F.2d 831, 833–34 (2d Cir.1992) (citing *Loeffler v. Frank,* 486 U.S. 549, 557–58, 108 S.Ct. 1965, 100 L.Ed.2d 549 (1988)).

■ Similarly, determining the rate to apply for pre-judgment interest is within the discretion of the district court. *Endi-*

---

**10.** Since the jury seemed to base its award of back pay on the Defendants' economist instead of the Plaintiff's, Mr. Hyde submitted an award of prejudgment interest for back pay based on the Defendants' economist's figures at a rate of 9%. Dkt. No. 73, Hyde Aff., Ex. D; *see also supra,* Part 5.

*co Potatoes, Inc. v. CIT Group/Factoring, Inc.*, 67 F.3d 1063, 1071 (2d Cir.1995). Courts in the Second Circuit often apply the rate of interest set forth in 28 U.S.C. § 1961. *Hogan v. General Electric Company*, 144 F.Supp.2d 138, 141 (N.D.N.Y. 2001) *Robinson v. Instructional Sys., Inc.*, 80 F.Supp.2d 203, 208 (S.D.N.Y.2000).[11] Section 1961 provides in pertinent part:

Interest shall be allowed on any money judgment in a civil case recovered in a district court.... Such interest shall be calculated from the date of the entry of the judgment, at a rate equal to the weekly average 1–year constant maturity Treasury yield, as published by the Board of Governors of the Federal Reserve System, for the calendar week preceding the date of the judgment.[12]

The appropriate methodology employed in calculating the amount of pre-judgment interest involves three steps. *Hogan*, 144 F.Supp.2d at 141. First, the award should be divided pro rata over the appropriate time period. *Id.* (citing *Robinson*, 80 F.Supp.2d at 208). Second, once the award is divided, the average annual United States treasury bill rate of interest referred to in § 1961 will be applied. *Id.; see also Epter v. New York City Transit Authority*, 216 F.Supp.2d 131, 138 (E.D.N.Y.2002). Finally, in order to guarantee complete compensation to the plaintiff, the interest will be compounded annually. *See Saulpaugh v. Monroe Community Hospital*, 4 F.3d 134, 144 (2d Cir.1993) ("Given that the purpose of back pay is to make the plaintiff whole,

**11.** The Plaintiff asserts that "Federal law does not identify an interest rate to be applied to pre-judgment interest" and therefore the New York State interest rate of nine percent should be applied. *See* Dkt. No. 74, Pl. Mem. of Law in Supp. of Mot. for Atty. Fees, Costs, and Interest; N.Y. Civ. Prac. L. & R. 5001, 5004 (McKinney 1992). Accordingly, Plaintiff has submitted the following chart setting forth the applicable calculations for pre-judgment interest:

INTEREST 1999:
$5311 × .09 = **$ 477.99**
INTEREST 2000:
$5311 × .09 = $ 477.99
$13,138 × .09 = $1182.42
 **$1660.41**

INTEREST 2001:
$5311 × .09 = $ 477.99
$13,138 × .09 = $1182.42
$17,022 × .09 = $1531.98
 **$3192.39**

INTEREST 2002 (THROUGH 11–1–02):
$5311 × .09 = $ 477.99
$13,138 × .09 = $1182.42
$17,022 × .09 = $1531.98
$11,771 × .09 = $1059.39
 $4251.19 × 10/12 = **$3542.66**

TOTAL PREJUDGMENT INTEREST:
**$ 477.99 + $1660.41 + $3192.39 + $3542.66 = $8873.45**

The Court disagrees with the Plaintiff's statement that no federal law exists setting forth the applicable rate is wholly inaccurate. As stated above, generally courts within the Second Circuit "often apply the rate of interest provided in 28 U.S.C. § 1961." *Robinson v. Instuctional Sys., Inc.*, 80 F.Supp.2d 203, 208 (S.D.N.Y.2000) (cited by *Hogan v. General Electric Co.*, 144 F.Supp.2d 138, 141 (N.D.N.Y.2001) (D.J.Hurd)).

**12.** The method of calculating interest on money judgments in civil cases changed as of December 21, 2000. It was formerly calculated at "a rate equal to the coupon issue yield equivalent (as determined by the Secretary of Treasury) of the average accepted auction price for the last auction of fifty-two week United States Treasury bills."

it can only be achieved if interest is compounded.").

In light of the above calculation, Gatti's back pay award of $57,453 should be divided over fifty-one months (July 1998 to November 2002). This results in $1,126.53 per month or $13,518.35 per year in back pay. The rate of interest according to the most recent publication by the Board of Governors of the Federal Reserve System is 1.27 percent.[13] *See* Federal Reserve Statistical Release, Selected Interest Rates (Daily), *available at hat://wholehearted/releases/HE/update* (May 5, 2003); *see also Hogan v. General Electric Co.*, 144 F.Supp.2d at 141.

Applying this rate and compounding the interest annually results in an award of $2,275.31 in prejudgment interest.[14] Additionally, the judgment shall reflect a post-judgment interest rate of 1.27 percent, pursuant to § 1961.

### III. CONCLUSION

The jury has spoken in this case. This Court does not find that their verdict is completely absent evidence to support it and, moreover, there is not overwhelming

evidence in favor of movant even to suggest that reasonable and fair-minded men would arrive at a different verdict. Furthermore, the Court is not convinced that the jury reached a seriously erroneous result or that the verdict is a miscarriage of justice. For all of the reasons stated above, it is hereby

ORDERED, that the Defendants' Motion for a Judgment as a matter of law is **DENIED**; and it is further

ORDERED, that the Defendants' Motion for a New Trial is **DENIED**; and it is further

ORDERED, that the Plaintiff's Motion for Pre- and Post–Judgment Interest is **GRANTED AS MODIFIED**; and it is further

ORDERED, that the Plaintiff's Motion for Attorney Fees and Costs is **GRANTED AS MODIFIED** and that the Plaintiff is awarded attorney fees and costs in the amount of $94,344.63.

SO ORDERED.

---

13. Even though 28 U.S.C. § 1961 is considered a post judgment interest statute, the statute's established rate calculation is applied retroactively as prejudgment interest. Furthermore, this is the appropriate rate to be applied, notwithstanding there are pendent state actions (i.e. ADEA and NYHRL). *See Hogan*, 144 F.Supp.2d at 138.

14. The calculation for prejudgment interest is as follows *:

| Year | Back Pay | Interest Rate | Interest | Interest |
|------|----------|---------------|----------|----------|
| 7/98–7/99 | $13,518.35 | 1.27% | $171.68 | $13,690.03 |
| 7/99–7/00 | $27,208.38 ** | 1.27% | $345.55 | $27,553.93 |
| 7/00–7/01 | $41,072.28 | 1.27% | $521.62 | $41,593.90 |
| 7/01–7/02 | $55,112.25 | 1.27% | $699.93 | $55,812.18 |
| 7/02–11/02 | $60,318.30 (4 mos.) *** | .89% (4 mos.) | $536.83 | $60,855.13 |

\* This chart was created in accordance with the calculations set forth by District Judge Hurd, Northern District of New York, in *Hogan v. General Electric Co.*, 144 F.Supp.2d at 141.

\* \* The amount of the previous year's back pay plus accrued interest is carried over and added to the back pay for the next year.

\* \* \* The final calculation is prorated: $1126.53 (back pay per mo.) \* 4 months = $4506.12 + $55,812.18 = $ 60,318.30